**STATE**

v.

**Harold T. DREW.**

No. 2005–108–C.A.

Supreme Court of Rhode Island.

April 18, 2007.

Virginia McGinn, Esq., Providence, for Petitioner.

Catherine Gibran, Esq., Providence, for Respondent.

Present: WILLIAMS, C.J., and GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Chief Justice WILLIAMS, for the Court.

On May 13, 2003, Harold Jackson Andrews (Jack)[1] was shot once in the back of his head, and his body was abandoned in a remote field in Exeter. His body was discovered more than two weeks later. On June 6, 2003, police arrested the defendant, Harold T. Drew (defendant), and his girlfriend, Bobbie–Jo Dumont, for the killing, and a grand jury subsequently indicted the defendant on seven separate counts, including murder.

At defendant's trial, the state painted a tragic portrait of the victim: a married man whose unrequited love for Ms. Dumont led him not only to tolerate her simultaneous romance with defendant, but also to facilitate a near two-year string of home invasions perpetrated by Ms. Dumont and defendant to support their heroin addiction. The state posited that once Jack renounced his complicity in the burglaries, defendant feared that Jack might divulge their transgressions to police. Knowing that he would be separated from Ms. Dumont if they were incarcerated and angered by what he believed to be Jack's abuse of Ms. Dumont, defendant plotted to kill Jack. A jury agreed, finding defendant guilty of murder, discharging a firearm while committing a crime of violence, and three counts of entering a dwelling with the intent to commit a larceny therein. He subsequently was sentenced to two consecutive life terms at the Adult Correctional Institutions (ACI). On appeal, defendant raises multiple arguments of error. For the reasons set forth herein, we affirm the judgment of the Superior Court.

## I
## Facts and Travel

Before 2001, Jack and Connie Andrews led a comfortable, normal life. Mrs. Andrews candidly recalled that she and her late husband enjoyed a "good marriage," spanning three decades. This all changed, according to Mrs. Andrews, with the regrettable advent of Ms. Dumont, a stripper whose charms lured Jack away from his wife.

Ms. Dumont, the state's key witness, testified that she first met Jack one night in 2000 while she was working at Cheaters, a Providence strip club. After this initial encounter, Jack visited the club every night and paid her "to sit with him and talk to him and dance for him." However, the nature of their casual acquaintance soon changed.

Ms. Dumont testified that when she met Jack she was regularly abusing alcohol, cocaine, methadone, and heroin. Desperately in need of money to support her drug habit, she soon had to call Jack for help. On that particular night, Jack picked up Ms. Dumont at her Warwick apartment, brought her to purchase drugs, gave her some money, and then dropped her back off at her apartment. From that point on Ms. Dumont and Jack saw each other daily; he bought her drugs, clothes and food, and he gave her money to pay rent and bills. Ms. Dumont also recalled that Jack took her anywhere she wanted to go in his pickup truck.

Although she knew he wanted more, Ms. Dumont told Jack she could manage only a friendship. She knew her relationships with other men made Jack jealous, but she warned him that was the price of her companionship. Ms. Dumont stated that although their relationship was not sexual

---

1. According to trial testimony, Harold Andrews commonly was referred to as "Jack." We shall continue to refer to him by this name.

at first, Jack eventually started demanding sex in exchange for money, and she obliged. She made it very clear, however, that she would leave Jack if he ever stopped giving her money.

Sometime in 2001, Ms. Dumont stopped working at Cheaters. As a result, she relied upon prostitution and Jack's goodwill for income. Ms. Dumont testified that in early 2001, she lost custody of her four children and was evicted from her apartment. Jack then paid for Ms. Dumont to stay in various motels and, on occasion, would even sneak her into his Exeter home while his wife slept to allow his mistress to spend the night on the floor next to his bed. It was also in 2001 that Jack first told his wife he was caring for Ms. Dumont.

Mrs. Andrews testified that about this time her marriage began to deteriorate. According to Mrs. Andrews, Jack often did not return to their Exeter home for two, sometimes three, days at a time. He became moody and they stopped speaking with each other. He stopped caring for his ill mother and he was always arguing with his stepson. He started losing weight and stopped going to work. Mrs. Andrews testified that Jack "wasn't even the same person." In August 2002, Mrs. Andrews left Jack.

Although Jack continued to provide for Ms. Dumont, in the fall of 2002 Ms. Dumont was admitted into SSTAR of Rhode Island (SSTAR), a detoxification service provider in North Kingstown; this is where Ms. Dumont first met defendant. According to Ms. Dumont, she and defendant "were just perfect for each other." In fact, both Ms. Dumont and defendant were prematurely expelled from the week-long detoxification program when the two were caught having sexual relations on SSTAR property.

Ms. Dumont testified that after her expulsion from SSTAR, she stayed with defendant in abandoned buildings and cars, eventually ending up in a van parked in defendant's father's yard. Nevertheless, Jack continued to dutifully take Ms. Dumont to get her methadone dose every morning. Ms. Dumont testified that Jack did not approve of her relationship with defendant and that relations between the two men were strained.

In October 2002, Jack lost his job, and Ms. Dumont and defendant were left without sufficient funds to support their $200–per–day drug habits. Ms. Dumont testified that as a result, she and defendant, with Jack voluntarily providing transportation, began perpetrating a string of breakings and enterings throughout South County,[2] committing at least one burglary almost every day. Typically, Jack would drive Ms. Dumont and defendant to a predetermined target and wait a few minutes until they emerged with bed quilts full of stolen goods.

According to Ms. Dumont, the first and only time Jack entered a residence was to assist defendant in carrying a heavy gun locker from the basement of a Richmond home. Once they loaded the locker into Jack's truck, they drove to a secluded field off a gated dirt path at the end of William Reynolds Road in Exeter, where they pried open the locker, collecting several rifles, a couple of shotguns, a handgun, and some ammunition. They then went to defendant's father's house, where they stored

---

**2.** South County is not a county in the traditional sense, but rather a regional, geographic tourism district that includes the following Rhode Island municipalities: Charlestown, Coventry, East Greenwich, Exeter, Hopkinton, Narragansett, North Kingstown, Richmond, South Kingstown, Westerly, and West Greenwich. G.L.1956 § 42–63.1–5(a)(1).

the weapons in the closet of a vacant second-floor bedroom.

Throughout this time, Jack and his wife kept in touch. Mrs. Andrews testified that until his death in May 2003, Jack visited her daily at the Westerly motel where she worked, or at least would call if he could not make it. Occasionally he spent the night, but he always left by 6:30 a.m. to get Ms. Dumont to the methadone clinic. According to Mrs. Andrews, during one of these visits, shortly before his death, Jack told her he was beginning to fear Ms. Dumont. On May 11, 2003, Jack said goodbye to his wife for the last time.

On the morning of May 12, 2003, Jack left to pick up Ms. Dumont as usual. At some point, the two began fighting when Jack told Ms. Dumont that he no longer wanted a part in the burglaries and that she had to choose either him or defendant. Ms. Dumont testified that she became upset and attempted to flee from Jack's truck, but he pulled her back in. In response, Ms. Dumont struck Jack and he hit her back.

Ms. Dumont testified that she told defendant about the altercation. She stated that defendant became enraged at the thought of Jack touching Ms. Dumont. He said that he would not let anyone hurt her and that he wanted to kill Jack. The next day, at defendant's request, Ms. Dumont called Jack and persuaded him to help her and defendant dispose of the guns.

According to Ms. Dumont, the three returned to the vacant field off William Reynolds Road, where defendant instructed Ms. Dumont and Jack to wipe off the fingerprints from the discarded gun locker.

The defendant retrieved the guns from the bed of Jack's pickup. Ms. Dumont and Jack were bent over, wiping down the gun locker when she saw defendant approach Jack from behind, raise a shotgun to his shoulder, and pull the trigger. Ms. Dumont then witnessed Jack fall to the ground.

Stunned, Ms. Dumont testified that she and defendant ran back to Jack's truck as defendant pleaded, "We got to get out of here." Before they left, however, defendant returned to the body, searched Jack's pockets, and stole his wallet; Ms. Dumont covered Jack's body with a quilt and the empty gun locker. As the two drove away in Jack's truck, Ms. Dumont asked defendant, "What the f**k, dude?" The defendant replied, "It had to happen. * * * This had to stop." Further along in the trip, Ms. Dumont testified that defendant reassured her that everything would be all right: "[H]e told me that if anything ever happened that I would just have to say it was an accident and that, uh, nobody could talk to me if I asked them for a lawyer."

Jack's body was discovered on June 1, 2003. Five days later, police arrested defendant and Ms. Dumont for the murder. On July 31, 2003, Ms. Dumont entered into a cooperation agreement with the state in which she would offer testimony implicating defendant in Jack's murder. Approximately one week later, the grand jury indicted defendant for murder in violation of G.L.1956 § 11–23–1, discharging a firearm while committing a crime of violence in violation of G.L.1956 § 11–47–3.2(b)(3), and three counts of entering a dwelling with the intent to commit a larceny therein in violation of G.L.1956 § 11–8–3.[3]

---

**3.** The defendant also was indicted on the additional counts of (1) using a firearm while committing a crime of violence in violation of G.L.1956 § 11–47–3.2(a) and (2) first-degree robbery in violation of G.L.1956 § 11–39–1(a)(3). The firearm charge was dismissed by stipulation. On defendant's motion, the robbery charge was severed before the start of trial; after defendant's sentencing in the instant case, the robbery charge was dismissed

While both defendant and Ms. Dumont were incarcerated at the Adult Correctional Institutions (ACI) before his trial, the couple exchanged several amorous letters. The letters defendant authored contained potentially damaging admissions. To no avail, defendant attempted to preclude the state from admitting three of the letters into evidence.

The defendant's trial began in October 2004. The state's case featured a number of witnesses and physical evidence, most notably the testimony of Ms. Dumont and Mrs. Andrews, who testified as discussed above. In addition, the state called William Reis, a twenty-five-year acquaintance of defendant with whom defendant shared a cell at the ACI following defendant's June 2003 arrest. Mr. Reis testified that defendant had described Jack's murder as an accident and had confessed that he "made a mistake." According to Mr. Reis, defendant then attempted to secure Mr. Reis's complicity in a scheme to implicate one Donald Porraro as Jack's murderer;[4] defendant later changed the plan to implicate Ms. Dumont as Jack's killer.

under Rule 48(a) of the Superior Court Rules of Criminal Procedure.

4. Mr. Reis testified that defendant asked him to inform the state police that defendant had revealed information about Jack's murder. The defendant's hope was that the state police would, as a consequence, equip Mr. Reis with a wiretap device in an effort to obtain incriminating information from defendant. Knowing this, defendant then would implicate Donald Porraro, a man to whom defendant had sold a handgun after he, Jack, and Ms. Dumont pilfered the gun locker. The defendant decided later to blame the murder on Ms. Dumont rather than Mr. Porraro.

5. The defendant has withdrawn two arguments he originally briefed to this Court. First, defendant initially posited that the trial justice erred by failing to read to the jury a

A jury convicted defendant on all five counts on November 10, 2004. On February 7, 2005, defendant was sentenced as follows: a mandatory life sentence for first-degree murder; a mandatory life sentence to be served consecutively to the murder sentence for discharging a firearm while committing a crime of violence; and ten years to serve for each of the three counts of breaking and entering to be served concurrently with each other and the life sentence imposed for first-degree murder. The defendant timely appealed his conviction.

On appeal, defendant raises several arguments. We address each in turn.[5] Additional facts will be provided as necessary.

## II

## Analysis

## A

## Jury Instructions

The defendant first argues that the trial justice committed reversible error by omitting two instructions from his jury charge.

crucial portion of Ms. Dumont's testimony in response to a mid-deliberation jury question. The pertinent transcript, however, did not include the content of the testimony actually read back to the jury. As a result, defendant moved this Court to supplement the record with an affidavit authored by him attesting to what, in fact, was recited to the jury. This motion was denied on November 14, 2006. Without an adequate record to proceed, defendant withdrew the argument.

The defendant also argued that the trial justice violated the Double Jeopardy Clause of the Rhode Island Constitution when he sentenced defendant to two consecutive terms of life imprisonment for the same offense. Wisely recognizing that this question of law is settled, however, defendant withdrew this claim at oral argument. *See State v. Feliciano*, 901 A.2d 631, 647 (R.I.2006); *State v. Rodriguez*, 822 A.2d 894, 906–08 (R.I.2003).

General Laws 1956 § 8-2-38 requires that a trial justice "instruct the jury in the law relating to the action." *Accord State v. Dumas*, 835 A.2d 438, 441 (R.I. 2003); *State v. O'Brien*, 774 A.2d 89, 105 (R.I.2001). A trial justice "may instruct the jury in his or her own words as long as the charge sufficiently addresses the requested instructions and correctly states the applicable law." *Dumas*, 835 A.2d at 441 (quoting *State v. Mastracchio*, 546 A.2d 165, 173 (R.I.1988)). A trial justice's refusal to give a requested instruction, however, will not constitute reversible error "as long as the charge given adequately covers the law relating to the request." *State v. Dellatore*, 761 A.2d 226, 230 (R.I. 2000) (quoting *State v. Grundy*, 582 A.2d 1166, 1170 (R.I.1990)); *see also State v. Brown*, 798 A.2d 942, 949 (R.I.2002). Indeed, a trial justice should refrain from issuing a requested instruction "when the evidence does not support such instructions, especially when they might mislead or confuse the jury." *Dumas*, 835 A.2d at 441 (citing *Dellatore*, 761 A.2d at 231). On appeal, this Court reviews challenged instructions "in their entirety to ascertain the manner in which a jury of ordinary intelligent lay people would have understood them[.]" *State v. Coleman*, 909 A.2d 929, 938 (R.I.2006) (quoting *State v. John*, 881 A.2d 920, 929 (R.I.2005)).

### 1

### Accident Instruction

The defendant claims that the trial justice erroneously omitted a comprehensive accident instruction from his jury charge.

It will be recalled that part of the state's case against defendant included the testimony of jailhouse informant William Reis, who stated that defendant described Jack's death as an accident. As a result, defen-

dant requested that the following accident instruction be included in the jury charge:

"Third, the state must prove that the homicide was intentional. Every crime involves a physical element—the doing of the act—and a mental element—the wrongful or criminal intent. If that intent does not exist, then the act is not a crime. An example would be an accidental death. Accident is the opposite of intent. If a person kills another accidentally, he or she lacks the wrongful intent, which would, if the other elements were present, make the act a murder."

The trial justice, however, settled on the following instruction, in pertinent part:

"As to the word 'willfully,' you are instructed that an act is done willfully if it is done voluntarily and intentionally and not by mistake or accident. * * * You should consider all of the facts and circumstances in evidence that you think are relevant in determining whether the state has proved beyond a reasonable doubt that [defendant] acted with the required intent or state of mind."

The defendant objected, but the trial justice ruled that he was "satisfied that [the court] [had] sufficiently instructed the jury as to the required elements of first—and second-degree murder."

On appeal, defendant dwells upon the anemic reference to "accident" in the jury charge. However, we think the paucity of evidence admitted at trial to support the proposition that Jack's death was accidental did not oblige the trial justice to give a more comprehensive accident instruction. At oral argument before this Court, defendant admitted that accident was not a defense he pursued at trial. A review of the record confirms as much: defendant neither presented evidence in accord nor argued accident in his closing. In fact, it was the *state's* witness, Mr. Reis, who

offered the only testimony that was in any way supportive of an argument that Jack's death was accidental. Furthermore, to support his argument, defendant has managed only to cite decisions that clearly require more than a passing reference by a witness to the word "accident" to trigger a trial justice's obligation to issue an accident instruction.[6] The trial justice in the present case explicitly instructed the jury that Jack's murder only could have been committed "willfully if it [was] done voluntarily and intentionally *and not by mistake or accident.*" (Emphasis added.) Given the scant evidence of accident proffered at trial, any further mention of accident in the charge probably would have served only to confuse or mislead the jury. The trial justice committed no error.

### 2

### Accomplice Instruction

The defendant next faults the trial justice for failing to include an accomplice instruction in his jury charge. In advancing his argument, defendant beseeches this Court to overrule a substantial body of its own caselaw.

At the close of his case, defendant requested the following jury instruction, in

pertinent part: "[T]he law now is that the jury must look with particular care at the testimony of an accomplice and scrutinize it very carefully before they accept it."[7] Ultimately, however, the trial justice instructed the jury to "consider whether any witness would have [had] a motive to be truthful or untruthful in his or her testimony," and "whether the promise made to Ms. Dumont itself [was] a strong or impelling reason for a witness to lie, to fabricate, or to color her story."[8] On appeal, defendant contests the adequacy of this instruction because it did not include his requested accomplice provision.

 It is well settled in this jurisdiction that "it is not necessary for a trial justice to give an accomplice charge." *State v. Sivo*, 809 A.2d 481, 491 (R.I.2002); *see also State v. Marrapese*, 583 A.2d 537, 545 (R.I.1990); *State v. Mastrofine*, 551 A.2d 1174, 1176 (R.I.1988); *State v. Fenner*, 503 A.2d 518, 525 (R.I.1986). It is not "the function of a trial justice to act as advocate for either the prosecution or the defense. Counsel are given adequate opportunities to argue matters of credibility, including bias, motivation, anticipated benefits, or rewards." *Marrapese*, 583 A.2d at 545–46 (quoting *Fenner*, 503 A.2d at

---

6. Specifically, defendant lists the following decisions as support: *State v. Fetzik*, 577 A.2d 990 (R.I.1990); *State v. Cipriano*, 430 A.2d 1258 (R.I.1981); *Taylor v. State*, 164 Ga.App. 660, 297 S.E.2d 755 (1982); *City of Columbus v. Bee*, 67 Ohio App.2d 65, 425 N.E.2d 409 (1979); *State v. Best*, 31 N.C.App. 389, 229 S.E.2d 202 (1976); and *United States v. Lesina*, 833 F.2d 156 (9th Cir.1987). In each of these cases, there was a much stronger basis in the evidence warranting an accident instruction than in the instant case.

7. Although defendant's requested accomplice instruction actually spanned over an entire page, he directs us only to the above-quoted excerpt as indicative of the substance of his request.

8. The trial justice's pertinent instruction was as follows:

"You should consider the interest or lack of interest of the witness, if any, in the outcome of the case, and the bias or prejudice of any witness that testified, should you find so.

"You may consider whether any witness would have a motive to be truthful or untruthful in his or her testimony. The jury is entitled to consider, in weighing the testimony of a witness like Ms. Dumont, who has testified with certain promises made to her by the state, whether the promise made to Ms. Dumont itself is a strong or impelling reason for a witness to lie, to fabricate, or to color her story."

525). Thus, "[c]ounsel rather than the court are the appropriate agents to argue to the jury concerning the specific credibility or lack thereof of a particular witness." *Fenner*, 503 A.2d at 525. We note that this Court will consider overturning precedent only " 'if the motivating purpose is to eliminate inconsistency and anomalous results.' " *State v. Werner*, 865 A.2d 1049, 1056 (R.I.2005).

The defendant proffers no evidence to suggest that the present case undermines our existing law. In fact, for support he cites only foreign decisions that affirm jury instructions substantially similar to the charge given in the instant case. We see no merit in defendant's entreaty.

## B

### Evidentiary Challenges

The defendant next points to two evidentiary rulings as constituting reversible error.

■■■ "[T]he admissibility of evidence is within the sound discretion of the trial justice, and this Court will not interfere with the trial justice's decision unless a clear abuse of discretion is apparent." *State v. Brown*, 900 A.2d 1155, 1159 (R.I. 2006) (quoting *State v. Mohapatra*, 880 A.2d 802, 805 (R.I.2005)). Likewise, "[i]t is well settled in this jurisdiction that the trial justice has broad discretion in deciding whether or not to admit evidence of prior convictions under Rule 609 [of the Rhode Island Rules of Evidence]." *State v. Silvia*, 898 A.2d 707, 718 (R.I.2006). "[T]his Court will not overturn such a decision on appeal unless there has been an abuse of that discretion." *State v. Remy*, 910 A.2d 793, 797 (R.I.2006).

### 1

### Admissibility of Letters

The defendant argues that the trial justice erred by denying his motion *in limine* to exclude from evidence three letters defendant wrote to Ms. Dumont while they both were incarcerated at the ACI following their June 2003 arrests. All three letters contained cryptic passages that Ms. Dumont testified were references to Jack's murder.[9] On appeal, defendant contends that the letters were irrelevant and, alternatively, unduly prejudicial. Again, we disagree.

"All relevant evidence is admissible." R.I. R. Evid. 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." R.I. R. Evid. 401; *see also State v. Carvalho*, 892 A.2d 140, 148 (R.I.2006).

■■■ There can be no doubt that these three letters were relevant evidence. Coupled with Ms. Dumont's testimony, the first two letters clearly suggested defendant's motives for killing Jack and were probative of premeditation, an element of first-degree murder that the state was required to prove beyond a reasonable doubt. *See State v. Garcia*, 883 A.2d 1131, 1137 (R.I.2005) ("First-degree murder is a willful, deliberate, premeditated killing of a human being with malice aforethought.");

---

**9.** Specifically, the state referenced the following passages: in the first letter, a line that read, "Bobbi you are my wife, my princess and my little girl and just like always you know I will get even with *anyone* who hurts you. I know you know that I'm not talking s**t"; in the second letter, "Bobbi don't forget I'm a very very jealous dude and only you know what things I would do to keep what's mine 'mine' " ; and, in the third, "I need for you to stay out of trouble so in about three

*see also* § 11–23–1. The third letter, together with Ms. Dumont's testimony, also was relevant in that it could be understood as reflective of defendant's guilty knowledge: the letter could be read as encouraging Ms. Dumont, the only witness to defendant's crime, to comply with a scheme to cover up the truth about Jack's murder.[10]

▮▮▮ The defendant's argument that the three letters were unduly prejudicial is similarly without merit. " 'The mere fact that such evidence is prejudicial to a defendant does not render it inadmissible.' " *State v. Brown,* 900 A.2d 1155, 1164 (R.I. 2006). Although the letters painted a less than desirable portrait of defendant, certainly we cannot say that the trial justice abused his discretion by ruling that any prejudice they may have caused did not outweigh their probative value.

### 2

### Rule 609

▮▮▮ Next, defendant contends that the trial justice misapplied Rule 609 of the Rhode Island Rules of Evidence by permitting the state to introduce a prior conviction for manslaughter to impeach defendant's credibility if he chose to testify.

Before trial, defendant moved *in limine* to preclude the state from admitting several of his prior convictions for impeachment purposes. Despite defendant's considerable list of transgressions, after a hearing the trial justice ruled that only four prior convictions would be admissible to impeach his credibility if he chose to testify; one of

these—the only one defendant contests— was a 1982 conviction for manslaughter:

"[The Court]: The charge against [defendant] in this matter, the lead count, is the charge of homicide. There are other counts of breaking and entering.

"The prior convictions of—I'm now speaking specifically of the escape in 1992, in no way can this court fathom why the escape charge, if heard by the jury, would be for any purpose other than to be prejudicial to [defendant]. The 1993 conviction for simple assault, yes, it is a crime against a person similar of the lower variety than [*sic*] the charge in this matter, the charge of murder. The domestic assault in 1994, the court cannot see a reason other than to be extremely prejudicial to [defendant] in the event that he were to take the witness stand. The charge of felonious assault in 1988 which [defendant] received a one-year suspended sentence, again, is a dated matter, and the relevance of that is outweighed by the prejudice. The misdemeanor charge of shoplifting, 2001, again, the court rules that the prejudicial effect substantially outweighs the probative value of that evidence. The misdemeanor shoplifting in 2001, the court would rule similarly. The charge of larceny in 1999, the court would similarly rule that the prejudicial effect substantially outweighs the probative value. The charge of obstructing a police officer in 1999, the court rules that that, too, will substantially prejudice [defendant].

"Having so stated, given the theory of the prosecution in this matter, that [defendant], Ms. Dumont, and the decedent,

four [*sic*] months someone can come see you and talk about a strategy OK."

**10.** The defendant argues that the letters were relevant only if the jury engaged in an improper "pyramiding of inferences." *See State v. Kaba,* 798 A.2d 383, 393 (R.I.2002). The

defendant misunderstands the concept. Because Ms. Dumont's testimony linked the letters to Jack's murder, she bridged the inferential gap for the jury. Therefore, the relevance of these letters rose and fell on the credibility of Ms. Dumont, not on the tenuous inferences defendant suggests.

[Jack], were all engaged in a crime spree engaging in property crimes so that they could be able to support their addiction, the court will deny [defendant's] motion in limine to preclude the 2002 conviction for possession of a controlled substance, will allow the state to introduce evidence of the 1997 conviction for possession of heroin, will permit the state to introduce the evidence of the [breaking and entering] in 1990, and the conviction for manslaughter in 1982."

The defendant took exception to the trial justice's ruling:

"[Defendant]: Judge, I certainly will live with your ruling, * * * [and] I can understand when your Honor stated that if the state's theory here is that [defendant] was doing these [breaking and enterings] to satisfy a drug habit, I guess I can live with * * * your ruling about the possession of controlled substances, the [breaking and entering] and the past heroin charge, but I don't see how the manslaughter conviction would fit into that."

The trial justice replied:

"The Court: It does not, it truly does not fit into that, but the fact remains * * * that [defendant] does have a prior conviction for manslaughter. The charge in this matter is a charge of homicide. The court will permit the state to introduce that in the event [defendant] exercises his right to testify."

On appeal, defendant contends that the trial justice improperly found admissible the manslaughter conviction as probative of propensity rather than veracity. He claims that the similarity between that offense and the one for which he was being tried generated a high degree of prejudice that outweighed the conviction's probative value and that the trial justice abused his discretion when he permitted the state to use it to impeach his credibility if he testified. The defendant further argues that this error prevented him from testifying in contravention of his constitutional right to do so. We disagree.

"Under Rule 609(b) * * * any conviction can be used for impeachment purposes unless the court determines that its prejudicial effect substantially outweighs its probative value." *State v. Medina,* 747 A.2d 448, 449–50 (R.I.2000); *see also* Rule Evid. 609(b). Rhode Island's Rule 609 manifests a recognition that there is a

"basis in reason and experience why one may place more credence in the testimony of one who has lived within the rules of society and the discipline of the law than in that of one who has so demonstrated antisocial tendency as to be involved in and convicted of serious crime." *State v. Mattatall,* 603 A.2d 1098, 1117 (R.I.1992) (quoting *State v. Sands,* 76 N.J. 127, 386 A.2d 378, 386 (1978)).

Thus, "[t]he factfinder has a right to consider whether one who repeatedly refuses to comply with the law is more likely to ignore the obligation of truthfulness than a law-abiding citizen." *State v. Pope,* 414 A.2d 781, 784 (R.I.1980), *overruled on other grounds, State v. Acquisto,* 463 A.2d 122 (R.I.1983).

Although some jurisdictions are more reluctant to do so, *see, e.g., State v. Harrell,* 199 Conn. 255, 506 A.2d 1041, 1044 (1986); *State v. Stewart,* 646 N.W.2d 712, 716 (N.D.2002),[11] this Court repeatedly has

---

11. This distinction is due, in no small part, to the difference in the wording of the respective states' rules of evidence governing the admission of prior convictions to impeach a witness. For example, Rule 609(a) of the North Dakota Rules of Evidence permits a criminal defendant to be impeached with a prior felony conviction only if a trial justice first deter-

"upheld the use of prior convictions for impeachment purposes even when the convictions were similar or identical to the crime for which that defendant stood trial." *Remy*, 910 A.2d at 796, 799 (permitting the state to impeach a defendant who opted to testify at his trial for assault with a dangerous weapon with prior convictions for simple assault and misdemeanor domestic assault); *see also State v. Rodriquez*, 731 A.2d 726, 731–32 (R.I.1999) (permitting, *inter alia*, prior convictions for breaking and entering with the intent to commit armed robbery and assault with intent to rob to impeach a defendant in his robbery trial); *State v. Taylor*, 581 A.2d 1037, 1039 (R.I.1990) (allowing a prior breaking and entering conviction to impeach a defendant at his robbery trial); *State v. Maxie*, 554 A.2d 1028, 1031–32 (R.I.1989) (allowing prior convictions for attempted larceny and robbery to impeach the credibility of the defendant at his robbery trial). Therefore, in Rhode Island, a prior conviction similar or identical to a charged offense is not presumptively prejudicial; instead, the similarity of a prior conviction to a charged offense is only one factor for the trial justice to consider when balancing the probative value of the prior conviction against its prejudicial effect.

The trial justice's articulated rationale in this case was most unfortunate: by finding admissible two prior convictions that were similar to the charged offenses while excluding other prior convictions seemingly because they were dissimilar to the pending charges, the trial justice erroneously invited the inference that the prior manslaughter conviction was admissible as pro-

bative of propensity rather than for impeachment purposes.

■■■ Very significantly, however, even if we were able to determine definitively that the trial justice found defendant's prior manslaughter conviction admissible solely because it was probative of propensity, it is well settled that this Court may affirm a trial justice's evidentiary ruling "even though the specific grounds relied upon by the [trial] justice were erroneous." *State v. Froais*, 653 A.2d 735, 738 (R.I. 1995) (emphasis omitted); *see also State v. Ellis*, 619 A.2d 418, 426 (R.I.1993). Although we agree that propensity is an improper basis for admitting a prior conviction under Rule 609, ultimately the prior manslaughter conviction in this case was properly ruled admissible because it was of probative value with respect to defendant's credibility. If defendant had chosen to take the stand, undoubtedly he would have advanced his sole defense— that Ms. Dumont killed Jack. The direct evidence that would have contradicted defendant's account of the crime was the testimony of two witnesses: Ms. Dumont, an eyewitness, who testified that defendant committed the murder; and Mr. Reis, who claimed that defendant initially confessed to killing Jack, but insisted that the homicide was an accident. In light of our caselaw, we cannot say that the prejudicial effect of the manslaughter conviction substantially outweighed its probative value as an impeachment tool, nor can we conclude that the trial justice's ruling was an abuse of discretion, regardless of why he found the prior conviction probative.

mines that "the probative value of admitting that evidence outweighs its prejudicial effect to the accused." *State v. Stewart*, 646 N.W.2d 712, 715 (N.D.2002) (quoting N.D. R. Evid. 609(a)(i)). By contrast, Rule 609 of the Rhode Island Rules of Evidence permits a criminal defendant to be impeached with any prior conviction "unless the court determines that its prejudicial effect substantially outweighs its probative value." *State v. Medina*, 747 A.2d 448, 449–50 (R.I.2000).

The defendant also argues that "[b]ecause of the sure admission of the manslaughter conviction, [defendant] did not testify." We must interpret this as an allegation that the trial justice's ruling denied defendant his constitutional right to testify by forcing him to be confronted, had he opted to take the stand, with his prior manslaughter conviction. *See* U.S. Const. Amends. VI, XIV; R.I. Const. art. 1, sec. 10. The defendant's claim is without merit. There can be no doubt that a criminal defendant with a felonious past is faced with a difficult dilemma when deciding whether to testify in his or her own defense: "One horn of the dilemma is that if he stays off the stand, his silence alone might prompt the jury to believe him guilty. The other horn is that if he elects to testify, his 'record' becomes provable to impeach him, and this again could doom his defense." 1 *McCormick on Evidence* § 42 at 198 (Kenneth S. Brown, ed., 6th ed.2006). However, as the United States Supreme Court has made clear, "[a] defendant may decide not to take the witness stand because of the risk of cross-examination. But this is a choice of litigation tactics." *Jenkins v. Anderson*, 447 U.S. 231, 238, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980). "[T]he constitutional right to testify does not carry with it a right to prohibit impeachment by prior convictions." *Harrell*, 506 A.2d at 1045 (citing *McGautha v. California*, 402 U.S. 183, 215, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971)). The defendant in this case had no constitutional right not to be confronted with his prior manslaughter conviction.

Before concluding, we must address the state's argument that our recent decision in *State v. Silvia*, 898 A.2d 707, 718 (R.I. 2006), should be dispositive of our consideration of this issue. In *Silvia*, this Court announced that "[w]e shall henceforth follow the practice established by the United States Supreme Court for the federal courts in the case of *Luce v. United States*, [469 U.S. 38, 105 S.Ct. 460 (1984)]." *Silvia*, 898 A.2d at 718–19. That is, "to raise and preserve for review the claim of improper impeachment with a prior conviction, a defendant must testify." *Id.* at 719 (quoting *Luce*, 469 U.S. at 43, 105 S.Ct. 460). Of course, in the instant case, defendant chose not to testify, a decision that would have resulted in a waiver of this argument on appeal under the rule set forth in *Silvia*. However, the *Silvia* decision was to be applied prospectively only, as indicated by our conspicuous use of the word "henceforth." *Id.* Because defendant filed his appeal before *Silvia* was decided, certainly he did not have the benefit of that decision to guide his trial strategy. We have not, therefore, applied *Silvia* to dismiss his Rule 609 argument.

Nevertheless, this case is a prime illustration of the wisdom of the *Silvia* rule. Without the benefit of defendant's actual trial testimony, "[a]ny possible harm flowing from a [trial] court's *in limine* ruling permitting impeachment by a prior conviction is wholly speculative." *Silvia*, 898 A.2d at 719 (quoting *Luce*, 469 U.S. at 41, 105 S.Ct. 460). First, we would have no way of knowing whether the trial justice ultimately would have permitted the state to impeach defendant with this manslaughter conviction at trial, especially absent any indication that his *in limine* decision was final. *See Brown*, 900 A.2d at 1162 n. 4 (noting that unless "unequivocally definitive," an *in limine* ruling " 'need not be taken as a final determination of the admissibility of the evidence referred to in the motion' "). In addition, there is no way to know whether the state actually would have used the manslaughter conviction to impeach defendant had he opted to take the stand. Indeed, we do not know if defendant would have testified at all, irrespective of any evidentiary rulings con-

cerning the admissibility of his criminal record, or any portion thereof. Furthermore, without defendant's trial testimony we "would be handicapped in [our] ability to evaluate the trial justice's weighing of the probative value of the prior conviction against its prejudicial effect * * *." *Silvia*, 898 A.2d at 719. We are also troubled that defendant, despite now alleging a constitutional violation, never thought it important enough to indicate at the *in limine* stage that he would not testify as a result of the trial justice's ruling or later to move the trial justice to reconsider his decision. Thus, without the necessary record generated by defendant's actual trial testimony, we would be unable to confirm the accuracy of defendant's claim that the admission of his prior manslaughter conviction as impeachment evidence prompted him not to testify, nor would we be able to gauge any harm that might have flowed from the trial justice's preliminary ruling. *Cf. Harrell*, 506 A.2d at 1046–47 (applying a similar analysis).

## C

### Limited Cross–Examination of State's Witness

█ The defendant next argues that the trial justice violated his constitutional right to confrontation when he limited his cross-examination of Ms. Dumont.

To promote his sole defense at trial, defendant elicited testimony from Mrs. Andrews on cross-examination that Jack and Ms. Dumont shared a "tumultuous relationship," characterized by Ms. Dumont's "violent temper" that occasionally erupted into physical abuse. According to Mrs. Andrews, just before he disappeared Jack had told his wife he was afraid of Ms.

Dumont. During Ms. Dumont's cross-examination, however, she resisted defendant's attempts to depict her as an aggressor, instead insisting that she only hit Jack in self-defense. In an attempt to impeach Ms. Dumont's characterization of the relationship, defendant sought to confront her with Mrs. Andrews's previous testimony:

"Q: If I told you that Jack's wife testified in this case already and said that Jack told her that you used to beat on him and that he was beginning to get afraid of you—

"[State]: Objection.

"The Court: Sustained."

After hearing arguments at side bar, the trial justice ruled that defendant's question was impermissible because it invited Ms. Dumont to comment on the credibility of Mrs. Andrews's testimony.[12]

█ Inherent in a criminal defendant's constitutional right to confront witnesses against him or her—found in both article 1, section 10, of the Rhode Island Constitution and the Sixth Amendment to the United States Constitution—"'is the fundamental right of the criminal defendant to cross-examine his or her accusers.'" *State v. Stansell*, 909 A.2d 505, 509 (R.I.2006). This right to cross-examination, however, is not unbounded. *Id.* at 510; *State v. Oliveira*, 730 A.2d 20, 24 (R.I.1999). As we have held previously, "trial justices are accorded wide discretion to curtail cross-examination after there has been 'sufficient cross-examination to satisfy the Sixth Amendment.'" *Stansell*, 909 A.2d at 510 (quoting *Oliveira*, 730 A.2d at 24). Therefore, "[a] trial justice's decision to limit the scope of cross-examination is reviewed for clear abuse of discretion; the decision will be overruled 'only if such abuse constitutes prejudicial error.'" *Id.*

---

12. The defendant had argued at side bar that. Ms. Dumont's response to his question was admissible pursuant to Rule 804(c) of the Rhode Island Rules of Evidence. The trial justice ruled otherwise. The defendant has not pursued this argument on appeal.

(quoting *Oliveira,* 730 A.2d at 24). "Irrelevant questions and lines of questioning that offer to produce no probative evidence need not be permitted by the trial justice and may be properly limited." *State v. Gasparico,* 694 A.2d 1204, 1208 (R.I.1997).

Furthermore, it is well settled that "a witness is not permitted to offer an opinion concerning the truthfulness of the testimony of another witness." *State v. Higham,* 865 A.2d 1040, 1045 (R.I.2004) (quoting *State v. Haslam,* 663 A.2d 902, 905 (R.I.1995)). At the heart of this rule lies the venerable principle that "[t]he determination of the truthfulness or credibility of a witness lies within the exclusive province of the jury." *Id.* "Even when a witness does not literally state an opinion concerning the credibility of another witness but his or her testimony would have the same 'substantive import,' such testimony is inadmissible." *Id.* "[A]s a general rule, [such] questions have no probative value and are improper and argumentative because they do nothing to assist the jury in assessing witness credibility in its factfinding mission and in determining the ultimate issue of guilt or innocence." *State v. Singh,* 259 Conn. 693, 793 A.2d 226, 237 (2002) (quoting *State v. Pilot,* 595 N.W.2d 511, 518 (Minn.1999)).

In the instant case, defendant's question would not have assisted the fact-finder in any way and, therefore, was irrelevant. Had the query been permitted, undoubtedly it would have provoked Ms. Dumont to comment impermissibly on the truthfulness of Mrs. Andrews's trial testimony. Therefore, to permit a response from Ms. Dumont would have invited her to opine impermissibly as to Mrs. Andrews's credibility, a function that is reserved exclusively for the jury. The trial justice did not abuse his discretion by discontinuing defendant's cross-examination on this particular point.

## D

### Refresh Recollection

The defendant finally argues that the trial justice abused his discretion by refusing to permit defendant to refresh Ms. Dumont's recollection.

When cross-examining Ms. Dumont, defendant sought to elicit from her a concession that she had used a third—and, to that point, unidentified—alias: Angela Wilkinson.[13] Ms. Dumont denied using this alias. Apparently, defendant's goal was to impeach her with yet another prior conviction; however, the District Court complaint charging the offense listed Bobbie–Jo Dumont a/k/a Angela Wilkinson as the alleged perpetrator. When defendant failed to coax Ms. Dumont into admitting using the alias, he then attempted to refresh her recollection with the District Court complaint. The state objected, arguing, *inter alia,* that because Ms. Dumont never indicated she needed her recollection refreshed, defendant could not furnish the document. The trial justice resolved the issue as follows:

"What I'll do * * * is allow [defendant] to lay a foundation for the use of this document. Ask Ms. Dumont if providing her with a document will refresh her recollection. If she says 'yes' or 'it may,' then I'll permit you to show her the document. If she says that it would not, then you will not use the document."

Upon resuming cross-examination, the following colloquy transpired:

Ashley Clarke.

---

13. Ms. Dumont already had testified that she was also known as Bobbie–Jo Pimental and

"[Defendant]: So, Ms. Dumont, if I showed you a document, a court record, a court paper, which charges you with assaulting a person named Thomas Robinson, assault with a dangerous weapon on September twenty-ninth of 2002, and the name of the defendant was Bobbie–Jo Dumont a/k/a Angela Wilkinson, would that refresh your recollection as to whether or not you were charged with this crime?

"[Ms. Dumont]: No, it wouldn't."

Further attempts to force Ms. Dumont to concede proved futile.

The defendant's entire argument on this point is that because *any* document can be used to refresh a witness's present recollection, the trial justice committed error by not permitting defendant to do so using the District Court complaint.

▮▮▮▮ "[A] trial justice is given wide discretion to permit or limit counsel's cross-examination of witnesses during trial, and that discretion, absent a showing of clear abuse, will not be disturbed on appeal, and then, only if such abuse constitutes prejudicial error." *State v. Briggs,* 886 A.2d 735, 745 (R.I.2005) (quoting *Oliveira,* 730 A.2d at 24). "The only foundational requirement for refreshing a witness's recollection is that the witness

clearly must be 'unable to remember something of relevance to the matter being litigated.'" *Id.* at 746 (quoting *State v. Presler,* 731 A.2d 699, 704 (R.I.1999)). However, "[a] witness's recollection cannot be refreshed simply because that witness's testimony conflicts with some other written statement." *Id.* at 746–47.

Contrary to defendant's contention in the present case, he was not denied the opportunity to refresh Ms. Dumont's recollection with the District Court complaint because the document was improper, but because, as the record confirms, Ms. Dumont said that the District Court complaint would not refresh her recollection.

The trial justice committed no error.

### Conclusion

For the reasons set forth herein, the judgment of the Superior Court is affirmed. The record shall be remanded to the Superior Court.