**Supreme Court**

No. 2012-131-C.A.

(W1/03-316A)

State                          :

v.                           :

Harold T. Drew.                  :

NOTICE:    This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                         :

v.                     :

Harold T. Drew.         :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

# O P I N I O N

**Chief Justice Suttell, for the Court.** The defendant, Harold T. Drew, appeals from a Superior Court order denying his motion for a new trial based on newly discovered evidence. After a jury trial, the defendant was convicted on one count of first-degree murder, one count of discharging a firearm while committing a crime of violence, and three counts of entering a dwelling with the intent to commit a larceny therein. This Court affirmed the defendant's conviction on appeal, State v. Drew, 919 A.2d 397 (R.I. 2007), and he then filed the instant motion for a new trial.[1] The defendant now argues that a recently discovered police narrative discloses new, material evidence concerning a cooperation agreement between the Swansea (Massachusetts) Police Department, the Rhode Island State Police, and a prominent state's witness in the defendant's murder trial, Bobbie-Jo Dumont.[2] The defendant also claims that the prosecution violated the defendant's constitutional due-process rights by failing to disclose the full extent of the cooperation agreement. This case came before the Supreme Court pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal

---

[1] This is defendant's second motion for a new trial. His first motion was made on November 18, 2004, and denied on December 1, 2004.

[2] The spelling of Dumont's first name is not consistent throughout the record. It appears in various documents as "Bobbie Jo," "Bobbie Joe," "Bobbie-Jo," and "Bobbi-Jo." We shall refer to her as Bobbie-Jo.

should not be summarily decided. After considering the parties' written and oral submissions and reviewing the record, we conclude that cause has not been shown and that this case may be decided without further briefing or argument. For the reasons set forth in this opinion, we affirm the order of the Superior Court.

# I

## Facts and Procedural History

This Court is familiar with the underlying facts of this case from defendant's first appeal, State v. Drew, 919 A.2d 397 (R.I. 2007), in which his conviction was affirmed. Three people were primarily involved in the events leading to defendant's arrest: Bobbie-Jo Dumont, Harold Andrews,[3] and defendant. Dumont and Andrews became acquainted in 2000 at a Providence strip club, where Dumont was employed as a stripper and Andrews was a customer. Id. at 400. Their relationship soon changed from a casual acquaintanceship to one in which Dumont relied on Andrews for money to support her drug addiction and to pay her bills, in exchange for which she obliged his sexual demands. Id. at 400-01.

Dumont met defendant in the fall of 2002, after she was admitted to a detoxification facility in North Kingstown. Drew, 919 A.2d at 401. The defendant and Dumont developed a romantic relationship, and both were prematurely expelled from the detoxification program after they were discovered having sexual relations on the premises. Id. The defendant and Dumont then continued to stay together in abandoned buildings and cars, while Andrews provided support for Dumont until Andrews became unemployed in October 2002. Id.

Dumont testified at defendant's trial that she, defendant, and Andrews perpetrated a string of breaking-and-entering crimes between November 2002 and June 2003, usually with

---

[3] Andrews is sometimes referred to as "Jack" in the record.

Andrews providing transportation while Dumont and defendant entered the residences.[4] On or around May 12, 2003, however, Andrews told Dumont that he no longer wished to participate in the break-ins, and the two engaged in a physical altercation. Dumont testified that, on the day after this altercation, she and defendant asked Andrews to drive them to a remote field in the Town of Exeter, where the three had previously stashed a gun locker, and Andrews agreed. Dumont further testified that, while she and Andrews were attempting to wipe fingerprints off the gun locker, she saw defendant shoot and kill Andrews.

The defendant and Dumont were arrested for Andrews's murder on June 6, 2003. Drew, 919 A.2d at 402. On July 31, 2003, Dumont entered into a cooperation agreement with the state, in which she agreed to plead to one charge of possession of heroin and two counts of breaking and entering committed within the state of Rhode Island. The agreement provided for Dumont to receive sentences of three years suspended/three years probation for the heroin possession charge and five years suspended/five years probation for the breaking-and-entering charges. The state also agreed to withdraw a pending bail-violation notice that had been filed pursuant to Rule 46(g) of the Superior Court Rules of Criminal Procedure in an unrelated matter. The agreement was executed in exchange for Dumont's past and future cooperation and testimony in connection with the prosecution of all criminal cases brought as a result of Andrews's murder.

It is undisputed that the state provided defendant with the following documents prior to trial: Dumont's cooperation agreement, Dumont's witness statements, and a narrative written by

---

[4] The exact number of breaking and enterings is not clear. On direct examination at trial, Dumont testified that she, defendant, and Andrews broke into houses "just about every day" between November 2002 and June 2003. On cross-examination, defense counsel asked Dumont if she had committed "around 18 breaking and enterings," and she answered affirmatively. According to a narrative written by Det. Gregory T. Ryan of the Swansea Police Department, Dumont said "she had committed approximately 80 house breaks and larcenies." Dumont's witness statement from August 7, 2003, lists seventeen specific addresses that she identified as part of the break-ins in which she participated.

Det. Arthur J. Kershaw of the Rhode Island State Police that described Dumont's cooperation with the state.

The defendant's trial began in October 2004, and included three days of testimony from Dumont. Detective Kershaw also testified, stating that he investigated a number of "B & E's" in the "South County" area in May 2003, and that he was thereafter assigned to the homicide investigation concerning Andrews's death in June 2003. On cross-examination, Det. Kershaw testified that he was aware that Dumont was involved in numerous breaking and enterings in Rhode Island and Massachusetts, and that she had agreed to cooperate with detectives in both jurisdictions. On November 10, 2004, defendant was convicted on one count of first-degree murder, one count of discharging a firearm while committing a crime of violence, and three counts of entering a dwelling with the intent to commit a larceny therein. Drew, 919 A.2d at 402-03. Judgment of conviction was entered in the Superior Court on February 7, 2005. The defendant filed a timely appeal on the grounds of evidentiary errors, erroneous jury instructions, and a Confrontation Clause violation; his conviction was affirmed by this Court on May 16, 2007.

On January 2, 2008, defendant filed the underlying motion for a new trial pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure, in which he asserted that, after his conviction in Rhode Island he was taken to Massachusetts to face additional breaking-and-entering charges. The defendant claimed that, during the course of the Massachusetts proceeding, he "discovered details of a cooperation agreement between the State's main witness, Bobbi Jo Dumont, and Massachusetts authorities." Specifically, defendant referred to a Supplemental Narrative of Det. Gregory T. Ryan of the Swansea Police Department, dated May

17, 2004.[5]  Detective Ryan's narrative reveals that he, Dumont, and Det. Kershaw traveled to the locations of four reported "house breaks" in Swansea, Massachusetts, with Dumont identifying the homes as being those where she, defendant, and Andrews had committed break-ins.[6]  The final paragraph of Det. Ryan's narrative states that "[a]s requested by Det. Arthur Kershaw, as part of her cooperation, Bobbie Jo Dumont will not be charged due to her assistance as a witness."  The state asserted that it was not made aware of Det. Ryan's narrative until after the close of defendant's trial, and defendant did not present evidence to challenge this assertion.

The defendant argued that Det. Ryan's narrative evidenced a cooperation agreement that should have been disclosed to defendant prior to trial and that this lack of disclosure prevented defendant from fully presenting his best defense in contravention of his due-process rights under Brady v. Maryland, 373 U.S. 83 (1963).[7]  The state filed an objection to defendant's motion on June 1, 2011, arguing that Det. Ryan's narrative did not reveal newly discovered evidence.[8]  The trial justice conducted an evidentiary hearing on June 1, 2011, with testimony from Dumont, Det. Ryan, and Det. Kershaw.  After the hearing, the parties filed additional memoranda, and, on March 23, 2012, the trial court entered an order denying defendant's motion, accompanied by a seventeen-page decision dated March 8, 2012.  The trial justice found no due-process violation and no reason for a new trial pursuant to Rule 33, reasoning that Det. Ryan's narrative did not

---

[5] Although Det. Ryan's narrative is dated "05/17/2004," it references break-ins that occurred during the spring of 2003.  The narrative states that Dumont recounted these break-ins for Det. Ryan and Det. Kershaw in August 2003, but conflictingly uses the date "Aug 8, 2004" as well.

[6] Detective Ryan's narrative also mentions one house identified in Somerset, Massachusetts, but does not provide specific information as to Dumont's involvement with that location.

[7] The defendant also argued that Dumont committed perjury by testifying that Det. Kershaw did not make any promises to her and that the state failed to disclose additional promises to not charge Dumont with murder or conspiracy to murder.  These arguments are not presented on appeal.

[8] It is unclear from the record why more than three years passed between defendant's motion and the state's objection.  The state's objection was filed in open court, on the same date as the motion hearing.

present new evidence and that the evidence was merely cumulative and impeachment evidence.[9] The defendant filed a timely notice of appeal.

## II

## Standard of Review

When reviewing a trial court's decision denying a motion for a new trial based on newly discovered evidence, this Court "will not overturn the trial justice's decision absent an indication that 'he or she overlooked or misconceived relevant and material evidence or was otherwise clearly wrong.'" State v. Price, 66 A.3d 406, 418 (R.I. 2013) (quoting State v. Hazard, 797 A.2d 448, 464 (R.I. 2002)). In contrast, "[t]his Court will 'apply a de novo standard of review * * * to mixed questions of fact and law that purportedly implicate a constitutional right.'" Richards v. Fiore, 57 A.3d 254, 257 (R.I. 2012) (quoting State v. Wiggins, 919 A.2d 987, 989 (R.I. 2007)). "Nevertheless, when we are called upon to conduct such a 'de novo review with respect to issues of constitutional dimension, we still accord great deference to a hearing justice's findings of historical fact and to inferences drawn from those facts * * *.'" DeCiantis v. State, 24 A.3d 557, 569 (R.I. 2011) (quoting Page v. State, 995 A.2d 934, 942 n.18 (R.I. 2010)). Accordingly, we will review the trial justice's Rule 33 decision for clear error, and we will review de novo the constitutional question of whether defendant's due-process rights were violated by the state's alleged failure to disclose the full extent of Dumont's cooperation agreement.

---

[9] The trial court also found that Dumont did not commit perjury and that the state did not consider or file charges against Dumont for murder or conspiracy to murder. As previously mentioned, these findings are not challenged on appeal.

## Discussion

On appeal, defendant argues that he did not receive any information, before or during his trial, regarding an agreement to not charge Dumont with the Massachusetts breaking and enterings. The defendant asserts that the state's failure to disclose this important information deprived him of the benefit of knowing the full extent of Dumont's cooperation agreement. The defendant also argues that, under the dictates of Brady, the prosecution had a duty to disclose the information contained in Det. Ryan's narrative regarding Det. Kershaw's request to not charge Dumont with the Massachusetts offenses. The defendant first argues that this alleged nondisclosure was deliberate, as evidenced by the fact that Det. Kershaw was the lead detective on defendant's case and sat at counsel table throughout defendant's trial. Alternatively, defendant argues that, even if the nondisclosure was not deliberate, a new trial is required because the undisclosed evidence was material. Specifically, defendant explains that the evidence was material because the state's case was highly dependent on Dumont's testimony, and knowing the full extent of her agreement with the state was essential to attacking her credibility.

The state responds by arguing that defendant's motion was properly denied because the evidence at issue fails the two-part test established by this Court for deciding new-trial motions based on newly discovered evidence. See Price, 66 A.3d at 417, discussed infra. First, the state argues that the evidence was not newly discovered because Dumont's cooperation agreement referred to "numerous" break-ins, and both Det. Kershaw's narrative and Dumont's witness statement mentioned that Dumont was involved in break-ins in Massachusetts. Further, the state argues that defense counsel demonstrated knowledge of the alleged new evidence by referring to

the Massachusetts break-ins, as well as the fact that Dumont had not been charged, during the cross-examinations of Dumont and Det. Kershaw at defendant's trial. Next, the state argues that the alleged new evidence was merely cumulative and impeaching rather than material, because the state disclosed the terms of Dumont's written cooperation agreement and the extent of Dumont's criminal activity was fully explored before the jury. Finally, the state argues that the alleged new evidence was not the kind that would likely change the verdict at a new trial because evidence demeaning Dumont's credibility, such as her significant drug use and criminal activity, was already presented at trial. As to the alleged Brady violation, the state asserts that Det. Ryan's narrative did not disclose any facts not previously known to defendant, as evidenced by defendant's trial strategy and the information contained in Det. Kershaw's narrative.

A

**The Defendant's Motion for a New Trial Based on Newly Discovered Evidence**

Trial courts use a two-pronged test when considering a motion for a new trial based on newly discovered evidence brought pursuant to Rule 33. See Price, 66 A.3d at 417.

> "The first prong encompasses a four-part inquiry, requiring that the evidence is (1) newly discovered since trial, (2) not discoverable prior to trial with the exercise of due diligence, (3) not merely cumulative or impeaching but rather material to the issue upon which it is admissible, (4) of the type which would probably change the verdict at trial." Id. (quoting State v. Woods, 936 A.2d 195, 197 (R.I. 2007)).

"The second prong, which is to be addressed only if the requirements set forth in the first prong have been satisfied, requires that the trial justice 'determine if the evidence presented is credible enough to warrant a new trial.'" Id. (quoting Woods, 936 A.2d at 197).

Here, the trial justice first clarified that the evidence at issue was not Det. Ryan's narrative itself; rather it was "only the possibility that the report contain[ed] evidence of an

undisclosed agreement that may [have] amount[ed] to evidence of a non-disclosure in violation of due process." The court did not find evidence to suggest that defendant was anything but diligent in his pretrial efforts to discover information. Next, the court found that defendant was aware, prior to his trial, that Dumont had been involved in break-ins in Massachusetts and that she was not charged in return for her cooperation. Specifically, the trial justice pointed to Det. Kershaw's narrative, which stated that, as part of her cooperation agreement, Dumont "agreed to identify 'numerous residences' in which she was involved in break-ins" and that she did in fact identify residences "throughout Rhode Island and Massachusetts." The trial justice also found that in Dumont's witness statement dated June 6, 2003, she identified seventeen such addresses, some of which were located in Massachusetts.[10] Further, the court found that defense counsel questioned Dumont about these break-ins during cross-examination at trial, in relation to her cooperation agreement. The court also found that defense counsel questioned Det. Kershaw about the cooperation agreement as referenced in his narrative, including Det. Kershaw's understanding that the agreement covered break-ins in both Massachusetts and Rhode Island.

Next, the trial justice found that, even if more information could have been provided regarding Dumont's cooperation agreement as it related to the Massachusetts crimes, the evidence would have been merely cumulative and impeaching rather than material and would probably not have changed the verdict at trial. The court found that, "given the amount of impeachment evidence presented to the jury at trial regarding Ms. Dumont's criminal past, it would have been difficult to show that more information regarding her past would shake any confidence in the verdict." Thus, the trial court found that the alleged newly discovered evidence failed the first prong of the test to be applied for Rule 33 motions based on newly

---

[10] The trial justice's decision referred to Dumont's statement dated June 6, 2003, but the August 7, 2003, statement was actually the one that contained the addresses of the various residences.

discovered evidence.[11]  There is no indication that the trial justice overlooked or misconceived relevant and material evidence while conducting this analysis; we therefore affirm the court's decision in this regard.

**B**

**The Defendant's Due-Process Claim**

In order to comply with the Due Process Clause of the United States Constitution, the state must "provide a criminal defendant with certain information." State v. McManus, 941 A.2d 222, 229 (R.I. 2008) (citing Brady, 373 U.S. at 87).  "[I]f a prosecutor has suppressed evidence that would be favorable to the accused and the evidence is material to guilt or punishment, the defendant's due-process rights have been violated and a new trial must be granted." Id. at 229-30.  Here, the parties disagree on the threshold issue of whether the state failed to disclose information regarding an agreement not to charge Dumont with the Massachusetts break-ins. The defendant claims that "[n]o information regarding an agreement not to charge Ms. Dumont with the Massachusetts B & E's was ever provided to [defendant] at any point before or during his trial."  Contrary to defendant's assertion, however, the state provided defendant with several documents implying that Dumont had participated in, but had not been charged with, the Massachusetts break-ins.  First, defendant received Det. Kershaw's narrative, which stated:

> "As part of a cooperational [sic] agreement with Attorney Generals [sic] Department, Bobbie Joe Dumont agreed to identify numerous residences in which she, Harold Drew and Harold Andrews had broken into throughout the year of 2003. Per the agreement, Bobbie Joe Dumont will not be prosecuted for her involvement with the breaks in return for her assistance with the homicide and breaks. At this time, [Rhode Island State Police] detectives travelled throughout Rhode Island and Massachusetts where numerous residences were identified by Miss Dumont * * *."

---

[11] Because the evidence failed the first prong of the two-part test, the court did not address the second prong.

- 10 -

Second, defendant received Dumont's witness statement dated August 7, 2003, in which she identified, as part of her cooperation agreement, seventeen residences that she had broken into. The list of identifications included four residences in Swansea, Massachusetts. Third, defendant received the written cooperation agreement between Dumont and the state of Rhode Island, in which Dumont agreed to plead to one charge of possession of heroin and two counts of breaking and entering in exchange for her "past cooperation and continued full cooperation and truthful testimony * * * in connection with the prosecution of all criminals [sic] cases brought as a result of a murder of Harold Andrews * * * and numerous breaking crimes committed by Harold Drew * * *."

Additionally, defendant's trial strategy suggests that he believed Dumont was not charged with the Massachusetts crimes in exchange for her cooperation with the state of Rhode Island. The following line of questioning occurred during defense counsel's cross-examination of Dumont, regarding the break-ins that she identified for the Rhode Island State Police:

> "Q    And you told investigators at the [Adult Correctional Institutions], including the Rhode Island State Police who were with you, that you did about 18 -- around 18 breaking and enterings, right?
> "A    I don't remember if I said that.
> "Q    You pointed out a lot to them?
> "A    Pointed out a lot to them.
> "Q    Did you count them?
> "A    I didn't count them, no.
> "Q    18 sound good to you?
> "A    What do you mean sounds good?
> "Q    Sound too high or too low?
> "A    As many as I pointed out, maybe.
> "Q    If I told you, going through your transcript in 2003, that there are 18 different locations that you brought the Rhode Island State Police to, would that be accurate?
> "A    Okay.
> "Q    Okay.  Now, you haven't been prosecuted for any of those B&E's, have you?

- 11 -

"A    No.

"Q    Has it been part of your deal with the prosecution that you're not going to be charged with those?

"A    I believe it's in the deal that, um -- that I -- that I tell them everything that I had a part of.

"Q    Have you been charged with any other B&E's other than the two that you pled nolo to back in July of 2003?

"A    No."

Similarly, when defense counsel cross-examined Det. Kershaw, counsel showed knowledge of the fact that Dumont had cooperated with Massachusetts police:

"Q    [Y]ou were aware that Ms. Dumont was involved with a number of B&E's in different towns throughout Rhode Island and in Massachusetts, nearby Massachusetts, correct?

"A    Yes.

"Q    Okay.  So, as part of her deal with the Attorney General's Office, she agreed to cooperate with detectives in those jurisdictions, correct?

"A    Correct."

The evidence at issue in this appeal is contained in one sentence of Det. Ryan's newly discovered narrative: "As requested by Det. Arthur Kershaw, as part of her cooperation, Bobbie Jo Dumont will not be charged due to her assistance as a witness."  This statement does not reflect any sort of formal agreement; rather, it illustrates a mere conversation between two detectives.[12]  During the defendant's motion hearing, Det. Kershaw testified that he recalled telling Det. Ryan to "hold off" on charging Dumont with the Massachusetts breaking and enterings.  He then stated that he recalled telling Det. Ryan about the agreement between Dumont and the state of Rhode Island and that he may have asked Det. Ryan "not to charge her at that time."  Detective Ryan testified that he did not have any direct contact with Dumont, did not directly promise her anything, and did not make any formal agreements with her.  When

---

[12] It is important to note that no evidence has been presented to suggest that Dumont executed a formal, written cooperation agreement with the Commonwealth of Massachusetts.

- 12 -

viewed in context with the other information the defendant was given prior to trial, it is clear that Det. Ryan's narrative revealed nothing that the defendant did not already know: Pursuant to her cooperation agreement with the state of Rhode Island, Dumont helped police identify the sites of four burglaries in Swansea, Massachusetts, and Dumont had not been charged with these burglaries at the time of the defendant's trial. Accordingly, we hold that the defendant's due-process rights were not violated because the state did not fail to disclose information regarding Dumont's cooperation agreement.

## IV

## Conclusion

For the reasons set forth in this opinion, we affirm the order of the Superior Court. The papers in this case may be returned to the Superior Court.



# RHODE ISLAND SUPREME COURT CLERK'S OFFICE

## *Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**         State v. Harold T. Drew.

**CASE NO:**         No. 2012-1313-C.A.
                     (W1/03-316A)

**COURT:**         Supreme Court

**DATE OPINION FILED:**   November 19, 2013

**JUSTICES:**         Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**         Chief Justice Paul A. Suttell

**SOURCE OF APPEAL:**   Washington County Superior Court

**JUDGE FROM LOWER COURT**:

                     Associate Justice Edward C. Clifton

**ATTORNEYS ON APPEAL:**

                     For State:   Virginia M. McGinn
                                  Department of Attorney General

                     For Defendant:  Catherine Gibran
                                  Office of the Public Defender