State                          :

v.                          :

Anderson Price.                          :

:

In re Anderson Price.                          :

:


NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State            :

      v.         :

Anderson Price.      :

                       :

In re Anderson Price.     :

                       :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Robinson, for the Court.** This case is before the Court on the defendant's appeal from a judgment of conviction on one count of child enticement in violation of G.L. 1956 § 11-26-1.5, which appeal has been consolidated with this Court's grant of the defendant's petition for a writ of certiorari seeking review of his having been adjudicated in contempt as a result of certain in-court conduct. On appeal, the defendant contends: (1) that the trial justice erred in denying his first motion for a new trial—which motion, according to the defendant, contended that there was insufficient evidence to support a conviction on the count of child enticement; (2) that the trial justice erred in denying his second motion for a new trial, which was

based on a claim of newly discovered evidence; and (3) that the trial justice erred in adjudicating him in contempt of court.

For the reasons set forth in this opinion, we affirm the judgment of conviction as well as the adjudication of contempt.

**I**

**Facts and Travel**

On October 30, 2008, the Attorney General charged defendant by way of a criminal information with one count of second degree sexual assault in violation of G.L. 1956 §§ 11-37-4 and 11-37-5 (count 1) and one count of attempting to persuade a minor child "to enter a vehicle with intent to engage in lewd, illicit or criminal conduct" in violation of § 11-26-1.5 (count 2).[1] The charges stemmed from an incident that occurred in North Kingstown on September 3, 2008.

The defendant's trial commenced on June 10, 2009, and the state presented the testimony of six witnesses: (1) James Leeds, a passenger in defendant's vehicle at the time of the

---

[1]    General Laws 1956 § 11-26-1.5, as amended by P.L. 2008, ch. 203, § 1 (which is entitled "Enticement of children") reads, in pertinent part, as follows:

> "(a) A person shall be guilty of a felony if that person attempts to persuade, or persuades a minor child under the age of sixteen (16) years, whether by words or actions or both, with intent to engage in felonious conduct against that child to either:
>     (1) Leave the child's home or school;
>     (2) Enter a vehicle or building; or
>     (3) Enter an area, with the intent that the child shall be concealed from public view; while the person is acting without the authority of: (i) the custodial parent of the child, (ii) the state of Rhode Island or a political subdivision of the state, or (iii) one having legal custody of the minor child.  Nothing contained in this section shall be construed to prevent the lawful detention of a minor child or the rendering of aid or assistance to a minor child."

September 3, 2008 incident; (2) Suzanne,[2] the complaining witness; (3) Dawn, a friend of the complaining witness; (4) Diane, the sister of Dawn; (5) James Bardin, the second passenger in defendant's vehicle; and (6) Officer Eli Mulligan of the North Kingstown Police Department. The defendant did not introduce any testimony or other evidence. We summarize below the pertinent evidence presented at trial.

## A

## The Evidence at Trial

## 1

## The Testimony of James Leeds[3]

James Leeds testified that he spent between two and two-and-a-half months in Rhode Island during the early Fall of 2008. He further testified that he knew defendant because they worked together. Mr. Leeds stated that defendant transported him to and from work, and he also stated that they "hung out somewhat after hours."

Mr. Leeds testified that, on September 3, 2008, he and defendant were together after work when, at some point, "probably between seven and eight p.m.," he and defendant and another person whom Mr. Leeds referred to as "Wade"[4] went for a ride in defendant's green van. Mr. Leeds further explained that he was in the passenger seat and defendant was driving the vehicle, while Mr. Bardin was seated behind them. He stated that the van pulled into a parking area of an apartment complex so that Mr. Bardin could carry out an errand.

---

[2]     We shall refer to the complaining witness and the other minor witnesses by pseudonymous first names in an effort to protect their privacy.

[3]     Mr. Leeds was called as a witness out of order so as to accommodate his logistical needs.

[4]     We infer from the record that the man whom Mr. Leeds identified as "Wade" is James Wade Bardin, another witness at defendant's trial. For the sake of clarity, we shall refer to "Wade" as Mr. Bardin.

It was Mr. Leeds's testimony that, once Mr. Bardin returned, the van moved to what was referred to as "the roadway area," at which point defendant "stuck his head out the window" to speak to a person whom Mr. Leeds referred to in his testimony as a "young lady." He stated that the young lady was "carrying things from her vehicle to the inside of her apartment." Mr. Leeds further testified that defendant "asked the young lady if she had an old man." Mr. Leeds stated that the young lady replied "no" to defendant, who then "put the van in park and got out of the van and walked over to her." Mr. Leeds further testified that defendant put his arm around the young lady for what he estimated to be forty-five seconds to a minute.

Mr. Leeds qualified his testimony by explaining that he had not been "watching every move" and by also explaining that he had been discussing "work-related issues" with Mr. Bardin. In response to a question from the prosecutor, Mr. Leeds testified that, although he was not watching the entire time, he did not see defendant grab the breast of the complaining witness or pull her towards the van. He stated that he heard defendant tell her that he was from Louisiana and that he had an ATM card and that he would "be back." Mr. Leeds testified that, following these exchanges, he was able to get defendant's attention by rolling down a window in the van and saying that they "need[ed] to go," at which point the three men left the parking lot.

**2**

**The Testimony of the Complaining Witness**

The complaining witness, Suzanne, testified that she was sixteen years old at the time of trial and had been fifteen years old at the time of the incident at issue. Suzanne testified that, on September 3, 2008, at around 8 p.m., she went to her mother's van in order to bring some laundry into their apartment.

Suzanne testified as to her recollection that a green minivan bearing a Maine license plate drove past her and that the driver spoke to her. When the prosecutor asked her to describe what the driver said to her, Suzanne replied that the driver had said in a loud voice: "Hey, baby." She added, however, that she was not sure whether that salutation was directed towards her and her two friends.

Suzanne further testified that, after the driver had uttered those words, "he just drove by and then he came back"; she added that he proceeded to "[get] out of the driver's seat." When asked if she recalled hearing anyone say anything from inside the van, she replied that, before the driver stepped out of the van, "the passenger guy told him not to get out of the car." The prosecutor asked Suzanne if the driver said anything else to her, and she replied that he asked her whether she had "a daddy or a boyfriend."

When asked by the prosecutor what the driver did after he exited the van, Suzanne responded that he walked directly to her, not to the two friends who were with her (Dawn and Diane). Suzanne testified that the driver did not say anything else at that point; she added, however, that he put his right arm around her and grabbed her right breast. She stated that he was whispering that he was from New Orleans and that he had an ATM card which he could give to her; she testified that, as he was saying those things, he was "touching" or "grabbing" her breast and that he "moved it around." She explained that she did not say anything to him because she was "scared of what was going to happen next"; however, later in the trial, she acknowledged that, when defendant approached her and spoke to her, she told him that she had a boyfriend and that he was "in the house." Suzanne testified that the next thing she recalled happening was the driver pulling her towards the van; she added that the top half of her body moved, although her legs "stayed."

Suzanne testified that, when she first tried to free herself from the driver's grasp, he pulled her more towards the van. She also testified that she "shook [her] body away from him" in an attempt to remove his arm. She further testified that, after he let go, he said "okay, okay" and went back to the van. She explained that she was within feet of the van and that only the driver's side door (which was facing her) was open. Suzanne added that, as the driver was returning to the van, he said that he was going to come back with his ATM card. She stated that her friends then told her to go inside to tell her mother and to call the police.

Suzanne further explained that ten minutes elapsed between the first time she heard defendant say something to her and the moment he departed in the van. She acknowledged that defendant had been touching her breast for three minutes. She additionally testified that she and her two friends were "together" during the entirety of defendant's interaction with her. Suzanne also described how, later in the evening of September 3, 2008, she identified defendant to the police. Suzanne also made an in-court identification of defendant as being the "person that did this to [her]."

The prosecutor also introduced into evidence the audio recording of the 9-1-1 call that the complaining witness and her mother made with respect to the September 3, 2008 incident as well as a transcript of what was said during that call. During the call, Suzanne was asked whether "they grabb[ed] any of you." Suzanne responded: "No, they, he tried to grab me, but I was like, sir, you need to, like back up and get in your car right now * * *."

When the prosecutor questioned Suzanne about what she meant when she said "tried to," she admitted that she had been "lying to the police officer"; she indicated that her reason for "lying" was that she had not wanted to call the police or tell anyone about the incident because she was embarrassed. Under cross-examination by defense counsel, Suzanne agreed that she

would sometimes lie in order to avoid being embarrassed. She further admitted that she had lied in the past (including to the police and the 9-1-1 operator) in order to avoid embarrassment. She also agreed that the reason the police were called was because "some guy tried to pick [her] up." When asked, Suzanne admitted that she never mentioned to the police that the man actually grabbed her or pulled her towards the van. She also admitted that neither did she tell her mother any of those details. Suzanne elaborated that she and her friends Dawn and Diane were speaking all at once to her mother when they told her about what had transpired.

**3**

**The Testimony of Dawn**

Dawn testified that she was twelve years old at the time of the trial and that she lived near the apartment complex where the September 3, 2008 incident occurred. Dawn stated that, around 7 p.m. on that day, she was helping Suzanne bring in some laundry. She recalled seeing a green van "go around the circle." Dawn testified that it was her recollection that there were three men in the van and that the man in the driver's seat exited the vehicle. She described the driver as "pretty tall" and also as "really tall," and she recalled that he was "pretty muscular." She admitted that, although she "[got] a good look at him," she did not see his face.

Dawn stated that she remembered the driver of the van "grabbing" Suzanne. Dawn further testified that she remembered him asking Suzanne if she had a boyfriend. She testified that she saw him put his arm around Suzanne's neck and that he then "grabbed her right boob" with his hand. She admitted that she was not looking at him the whole time, but she recalled that Suzanne stepped back and said, "Yo" and then said: "You need to, sir, you need to get back in your van." Dawn also testified that she heard the passenger tell the man three or four times to get back into the van; she added that the driver replied "shut up" to the passenger. She estimated

that the driver was outside the van for about ten minutes. She testified that the driver then returned to the van and "peeled out." Dawn agreed with defense counsel's estimate on cross-examination that the "whole incident took about 60 seconds."

Dawn also testified that Suzanne and Diane appeared "pretty scared," but that no one yelled or screamed. And, when asked on cross-examination whether the driver of the vehicle tried to grab Suzanne, or tried to pull or push her into the van, Dawn responded "no" to each question. She also admitted that, when she gave her statement to the police, she never told them that she could not see the face of the man who she said had touched Suzanne.

**4**

**The Testimony of Diane**

Diane testified that she was ten years old at the time of the trial and that Suzanne was more Dawn's friend than hers, but that she still "h[u]ng out with her."

She testified that, on the day that she was helping Suzanne, they were bringing in laundry at "dusk," after dinner. Diane testified that she remembered a green minivan pulling up and a man getting out and talking to Suzanne. She further testified that he said to Suzanne: "You're a hot momma * * *. Who's your daddy[?] I can be your boyfriend." She stated that, as the man was saying these things to Suzanne, she saw him put his right arm around Suzanne and touch "her left boob." She added that she was sure that neither of the other two persons exited the van. Diane testified that she also remembered the man saying that he had an ATM card and that he "would" or "could buy us anything we wanted." She stated that the man asked Suzanne where she (Diane) lived and that he was going to "come back and get [them] later." She explained that she was "scared and upset"; she said that she thought that the man was trying to kidnap them. Diane also testified that the man put his arm around Suzanne and tried to pull her into the van, at

- 8 -

which point Suzanne "backed up." In the course of her in-court testimony, Diane identified defendant as the man whose actions she had been describing.

On cross-examination by defense counsel, Diane testified that Suzanne had asked the man to return to the van. She also stated that the entire episode had lasted for approximately sixty seconds. Further on cross-examination, she acknowledged that she had never informed the investigating police officer that she saw defendant touch Suzanne's breast; she stated that the first time that she ever mentioned such an occurrence to anyone was during her testimony at a pretrial suppression hearing. She further agreed that the first time she ever told anyone that he tried to "grab [Suzanne] into the car" was during her testimony at trial.

**5**

**The Testimony of James Bardin**

James Bardin testified that he knew defendant and James Leeds because the three of them worked together. He testified that, on September 3, 2008, he entered the back seat of a green minivan and joined defendant, who was driving the minivan, and Mr. Leeds, who was sitting in the passenger seat. Mr. Bardin testified that they drove to an apartment complex, where he carried out an errand and then returned to the vehicle. He testified that, as they were backing out of the parking lot of the apartment complex, "there was a young lady by a van with three or four kids that [were] running around right there with her." Mr. Bardin further testified that defendant stopped the van beside the young lady and "hollered * * * through the window asking her if she had a boyfriend." Mr. Bardin stated that he told defendant that the "girl [did not] look quite old enough to even be talking to."

Mr. Bardin also testified that, while defendant was still in the van, defendant asked the young lady if she had a boyfriend or needed help; he added that defendant mentioned something

about having an ATM card and being able to take care of her. Mr. Bardin testified that, at that point, defendant exited the van and that defendant and the young lady proceeded to speak with each other for a few minutes. Mr. Bardin testified that he told defendant to get back into the van. He then testified that "it came up she had a boyfriend in the house" and that defendant returned to the van. Mr. Bardin added that defendant continued to speak to the young lady, repeating that he could take care of her. Mr. Bardin stated that defendant said she was a "good looking girl" and "that he would like to get to know her." Mr. Bardin testified that he was fairly sure that the windows of the van were down; he added that he was watching defendant the whole time. Mr. Bardin also testified that he "[n]ever" saw defendant "go up to the girl."

**6**

### The Testimony of Officer Eli Mulligan

Officer Mulligan testified that, as of the time of trial, he had been employed by the North Kingstown Police Department for approximately eight years. He testified that, on September 3, 2008, he was patrolling the northern end of the town when he received a dispatch advising him "that a green minivan with Maine plates was involved in an attempted abduction of a female juvenile." It was his recollection that he arrived on scene at approximately 8:20 p.m. and that he spoke separately with Suzanne, Dawn, and Diane.

Officer Mulligan further testified that, at some point, he learned that the green minivan had been located and that a suspect was being detained. He testified that he transported the three girls to the location of the green minivan and that each of them identified the green minivan as the one that they had seen at Suzanne's apartment complex. Officer Mulligan also testified that Suzanne and Diane identified defendant as the man who had been the driver of the van. On

cross-examination, Officer Mulligan acknowledged that he did not interview any other witnesses or gather any other evidence.

**B**

**The Jury Instructions and the Ensuing Verdict**

The trial justice instructed the jury regarding the child enticement charge as follows:

> "The defendant, Mr. Price, is charged in Count 2 with attempting to persuade a minor child under the age of 16, 16 years, by words or actions or both, to enter a vehicle with the intent to engage in felonious conduct against that child. In the context of this charge, felonious conduct refers to sexual assault in the second degree as I have defined that charge in my instructions in Count 1. If you find from all the evidence and reasonable inferences to be drawn from the evidence that the State has proved that the defendant, Anderson Price, on or about September 3rd, 2008, attempted to persuade [Suzanne], then under the age of 16 years, by word or action or both, to enter a vehicle, and that he did so with the intent to commit sexual assault in the second degree on [Suzanne], then you must find the defendant guilty. If, however, you find that the State has failed to prove any element of the crime charged in Count 2 beyond a reasonable doubt, you should return a verdict of not guilty." (Emphasis added.)[5]

On June 15, 2009, the jury returned a verdict; it found defendant not guilty of second degree sexual assault, but guilty of child enticement.

---

[5]    The charge to the jury on second degree sexual assault reads, in pertinent part, as follows:

> "On Count 1 the defendant has been charged with second degree sexual assault upon [Suzanne] on or about September 3rd, 2008. In order to find the defendant guilty of this charge, the State must prove beyond a reasonable doubt one, that the defendant engaged in sexual contact; to wit, hand to breast contact, with [Suzanne]. Two, that the defendant did so for the purpose of sexual gratification or arousal. And three, that the defendant accomplished that sexual assault by means of force or coercion."

# C

## Defendant's First Motion for a New Trial

The defendant filed his first motion for a new trial on June 18, 2009; he based that motion on what he contended was the lack of "credible evidence" of intent to commit second degree sexual assault against the complaining witness and the lack of evidence of intent to commit such a felony against her sufficient to sustain the conviction on the count of child enticement. The defendant emphasized that the jury instructions themselves, in addressing the enticement count, required that the prosecution prove that defendant had the intent to commit second degree sexual assault. The state countered that the jury's acquittal of defendant on the second degree sexual assault count did not preclude the guilty finding on the child enticement count. The state further argued that, for the purpose of the trial justice's review of the trial testimony, there was sufficient evidence of enticement so as to preclude the grant of the motion for a new trial.

At the conclusion of a hearing on the first motion for a new trial, the trial justice summarized from the bench the evidence presented at trial. He found that the evidence presented by Dawn and Diane was largely credible and corroborated Suzanne's testimony. He stated: "So, in sum, the evidence is ample * * * to support the jury verdict on [the child enticement count]. I see no inconsistency in the evidence." He further stated that "I accept the jury's verdict in [the child enticement count], and I happen to agree with it. I would come to the same conclusion." Accordingly, the trial justice denied defendant's first motion for a new trial.

## D

## Defendant's Second Motion for a New Trial

Subsequently, on September 11, 2009, defendant, citing Rule 33 of the Superior Court Rules of Criminal Procedure, moved for a new trial based upon what he contended was newly discovered evidence; he also contended that his right to due process had been violated. The defendant asserted that the complaining witness's medical records might indicate that she had been in counseling and was currently being treated; he argued that those records reasonably could be expected to contain statements made relative to her claims against him or otherwise exculpatory evidence. The trial justice granted defendant's motion for a subpoena <u>duces</u> <u>tecum</u> with respect to the medical records, which he said should be turned over to the court for <u>in</u> <u>camera</u> review. After the records had been reviewed by the trial justice and by counsel, the parties appeared before the trial justice on October 15, 2009 for a hearing on the second motion for a new trial.

In his second motion for a new trial, defendant argued that the medical records contained information that went to the credibility of the complaining witness, which records he said constituted newly discovered evidence that could not have been obtained before trial. The prosecutor objected, arguing that none of the records that were produced pursuant to the subpoena <u>duces</u> <u>tecum</u> would have been admissible at trial and that the result of the trial would not have been different had defense counsel been able to use the information contained within the records to impeach the complaining witness.

The trial justice explained that he too had reviewed the records and determined that the state had not been under an obligation to inquire of the complaining witness regarding the

psychological counseling that she had received.[6]  He additionally found that none of the information contained within the records, even if admissible, would have produced a different outcome.  The trial justice further noted that the jury had carefully weighed the testimony of the complaining witness, which weighing he said was "apparent from the verdict"; the trial justice specifically noted that the jurors had "rejected a portion of her testimony."  As to the guilty finding on count 2 (the enticement charge), the trial justice stated that the evidence of enticement that was testified to by the complaining witness was corroborated by the other witnesses— including the complaining witness's two friends and at least one of the passengers in defendant's van.  Accordingly, the trial justice denied defendant's second motion for a new trial.

## E

## The Finding of Contempt

At the conclusion of the hearing on defendant's second motion for a new trial on October 15, 2009, the trial justice denied the motion and stated that sentencing would take place on November 10 of that year.  The following exchange occurred immediately after the denial of the new trial motion:

> "THE DEFENDANT: I'm all set?
> "THE COURT: Scheduled for November 10, at two p.m.
> "THE DEFENDANT: I know that, your Honor. (Defendant laughing) This is comical.
> "THE COURT: You think this is comical?
> "THE DEFENDANT: I think this s * * * is comical.
> "THE COURT: You'll see if it's comical on November 10th.
> "**(Defendant being escorted from courtroom)**
> "THE DEFENDANT: Give them to me now.  Give them to me now.  F * * *.  You better be warned –
> "THE COURT: Bring him back in.
> "**(Defendant re-enters the courtroom)**

---

[6]     The defendant does not press on appeal the argument that he made during his second motion for a new trial concerning what he contended was the state's obligation to inquire of the complaining witness as to her psychological counseling.

"THE COURT: I'm going to ask the stenographer if she recorded what he said.

"COURT REPORTER: What I heard, your Honor.

"THE COURT: All right. Mr. Price, I'm finding you in contempt based on the outburst and your comments. You've got a serious attitude problem. I'm going to sentence you as a result of the adjudication of contempt. I'm going to wait until November 10th. Whatever sentence I give you is going to be consecutive to whatever happens on November 10.

"THE DEFENDANT: That's all you got for me?

"THE COURT: That's all I got. See you later.

"THE DEFENDANT: You ain't got my mind and my soul, tell you that. You better be warned wherever you stand before him you all better watch it.

"THE COURT: I better what?

"THE DEFENDANT: As you stand before God you all better watch it, um-hum. I'm innocent of this here.

"THE COURT: I better watch it? I'll sentence him now. 90 days consecutive to whatever term is imposed on the 10th."

The trial transcript concludes at that point, and it makes no mention of an objection having been voiced by defense counsel.

**F**

**The Sentencing**

At the sentencing hearing on November 10, 2009, the trial justice heard arguments of counsel and also heard from defendant's sister, who spoke on his behalf. The defendant apologized for his "outburst" at the time of the October 15 hearing. And, with respect to the conviction for child enticement, he maintained that it was never his intent to entice the complaining witness, but he nonetheless expressed regret for causing the complaining witness "any mental or emotional anguish."

On count 2 (child enticement), defendant was sentenced to five years, with four years to serve and one year suspended with probation. The trial justice also deemed defendant to be a

- 15 -

habitual criminal; as a result, defendant received a sentence of ten years suspended with probation.[7]

Prior to sentencing defendant with respect to the adjudication of contempt, the trial justice afforded him another opportunity to speak; defendant reiterated his apology. Counsel for defendant did not object to the contempt finding. As to the contempt charge, the trial justice stated that he "found [defendant's] words and behavior to be rude, disruptive and threatening, as well as contemptuous of the Court and the judicial process"; the trial justice then sentenced defendant to sixty days[8] to serve at the Adult Correctional Institutions consecutive to the term imposed on the enticement charge. All three sentences, including the sentence for having been deemed a habitual criminal, were to run consecutively.

On August 6, 2010, defendant filed a petition for a writ of certiorari seeking review by this Court of the finding of criminal contempt and the resulting sentence. In an order entered on September 23, 2010, this Court granted defendant's petition for a writ of certiorari and consolidated the contempt case with defendant's appeal from his conviction on the enticement charge.

## II

### Issues on Appeal

The following issues are now before this Court for decision: (1) whether or not the trial justice erred in denying defendant's first motion for a new trial; (2) whether or not the trial

---

[7]    The defendant filed a timely notice of appeal with respect to his conviction on count 2.

[8]    The record reflects that defense counsel asked for clarification from the trial justice, stating: "Your honor, last time we were here, you imposed 90 days. Are you vacating the 90 days and imposing 60 days consecutive?" The trial justice responded: "I am."

justice erred in denying defendant's second motion for a new trial; and (3) whether or not the trial justice erred in adjudging defendant in contempt of court.

## III

## Analysis

## A

### The Defendant's First Motion for a New Trial

On appeal, defendant first challenges his conviction on the enticement charge, asserting that there was insufficient evidence presented to the jury whereby his conviction could be sustained. The state asserts: (1) that defendant has waived this contention because he did not assert it before the trial justice; and (2) that, even if the issue was preserved, there was sufficient evidence presented below for this Court to affirm defendant's conviction.

Pursuant to our well-established raise or waive rule, this Court will "not review issues that were not presented to the trial court in such a posture as to alert the trial justice to the question being raised." State v. Kluth, 46 A.3d 867, 876 (R.I. 2012) (internal quotation marks omitted); see also DeMarco v. Travelers Insurance Co., 26 A.3d 585, 628 n.55 (R.I. 2011) ("It should be observed that the raise or waive rule is not some sort of artificial or arbitrary Kafkaesque hurdle. It is instead an important guarantor of fairness and efficiency in the judicial process."). We "staunchly adhere[]" to this rule. State v. Figuereo, 31 A.3d 1283, 1289 (R.I. 2011).[9]

---

[9] We recognize that an exception to the rule applies, in certain circumstances, when "basic constitutional rights are concerned." See State v. Figuereo, 31 A.3d 1283, 1289 n.7 (R.I. 2011) (internal quotation marks omitted); see also DeMarco v. Travelers Insurance Co., 26 A.3d 585, 629 n.56 (R.I. 2011) (discussing the "narrow exception to the 'raise or waive' rule"). We perceive no basis for applying that exception in this case.

We have previously noted that a "challenge to the sufficiency of the evidence is properly framed in terms of a challenge to the trial justice's denial of the defendant's motions for judgment of acquittal and new trial." State v. Lynch, 854 A.2d 1022, 1045–46 (R.I. 2004) (internal quotation marks omitted). Although this Court has "never held that the waiving of the right to appeal a denial of a motion for judgment of acquittal acts as a waiver of a right to appeal the denial of a motion for a new trial when it is based upon a claim of insufficient evidence," State v. Colbert, 549 A.2d 1021, 1023 (R.I. 1988), an argument seeking a new trial based upon insufficient evidence must still be made in the trial court for it to be preserved. See State v. Scanlon, 982 A.2d 1268, 1276 n.12 (R.I. 2009).

It is clear from the record in this case that defendant did not make a motion for a judgment of acquittal. The failure to make such a motion would not have precluded defendant from asserting an insufficiency of the evidence argument in a motion for a new trial. See State v. Clark, 974 A.2d 558, 570–71 (R.I. 2011). The defendant did, in fact, move for a new trial; however, it is clear from the record that that motion was not predicated on the insufficiency of the evidence, but rather challenged witness credibility and the weight of the evidence. See State v. Bido, 941 A.2d 822, 829 (R.I. 2008) (noting that "the moving party at the trial court level must articulate the motion in an understandable manner for the trial justice"). As we have stated, we "will not fault a trial justice for failing to rule upon a question that was not presented to him [or her] in a rational and recognizable posture." Id. (alteration in original) (internal quotation marks omitted). Instead, defendant's written motion for a new trial was premised on the weight of the evidence criterion, and his argument dealt in large part with the alleged lack of credibility of various witnesses. No reference was made in that written motion to the standard of review that

- 18 -

applies when a new trial motion concerns the insufficiency of the evidence, and the oral argument before the trial justice did not address the latter type of new trial motion.

Additionally, at the hearing on the motion, defendant argued again that the lack of "credible" evidence led to impermissible inferences. At that hearing, defense counsel, the prosecutor, and the trial justice all addressed the first motion for a new trial solely in terms of the weight of the evidence standard. It is clear that the question presented to the trial justice was whether the verdict was against the weight of the evidence, not whether the evidence itself was insufficient to sustain the verdict. See Bido, 941 A.2d at 829. We conclude that defendant has waived the opportunity to argue the insufficiency of the evidence before this Court; accordingly, we affirm the trial justice's denial of defendant's first motion for a new trial.

**B**

**The Motion for a New Trial Based Upon Newly Discovered Evidence**

The defendant also challenges the denial of his second motion for a new trial, which was based upon what he asserts was newly discovered evidence—namely, certain mental health records relating to the complaining witness. The state counters that the evidence would not have changed the verdict at trial and that, therefore, the trial justice correctly denied the second motion for a new trial.

When a trial justice is called upon to consider a motion for a new trial based upon newly discovered evidence, the analytical approach to be employed differs from that which is employed with respect to a motion based upon the insufficiency of the evidence. See State v. Woods, 936 A.2d 195, 197 (R.I. 2007). The proper analytical approach is two-pronged in nature: "The first prong encompasses a four-part inquiry, requiring that the evidence is (1) newly discovered since trial, (2) not discoverable prior to trial with the exercise of due diligence, (3) not merely

cumulative or impeaching but rather material to the issue upon which it is admissible, (4) of the type which would probably change the verdict at trial." Id. (internal quotation marks omitted); see also State v. Firth, 708 A.2d 526, 532 (R.I. 1998) (concluding that the evidence at issue "was merely impeaching and unlikely to have affected the verdict"). The second prong, which is to be addressed only if the requirements set forth in the first prong have been satisfied, requires that the trial justice "determine if the evidence presented is credible enough to warrant a new trial." Woods, 936 A.2d at 197 (internal quotation marks omitted).

This Court, when analyzing the trial justice's denial of a motion for a new trial based upon newly discovered evidence, will not overturn the trial justice's decision absent an indication that "he or she overlooked or misconceived relevant and material evidence or was otherwise clearly wrong." State v. Hazard, 797 A.2d 448, 464 (R.I. 2002) (internal quotation marks omitted).

After carefully reviewing the record, it is our view that the trial justice neither overlooked nor misconceived any relevant and material evidence—nor was he otherwise clearly wrong. See Hazard, 797 A.2d at 464. In his decision denying defendant's motion, the trial justice indicated that he had reviewed all of the records and found nothing exculpatory or contradictory in those records. See Woods, 936 A.2d at 197. The trial justice additionally found nothing that would have "likely produced a different outcome," and he questioned the admissibility of any of the evidence. Defense counsel also repeatedly emphasized the impact on the credibility of the complaining witness and how the documents themselves could not be admitted but rather would go towards impeachment of the witness. Thus, there is no indication that the records would have been admissible, that they would have been anything other than cumulative or impeaching, or that they would have changed the outcome of the trial. See Firth, 708 A.2d at 532.

# C

## The Finding of Contempt

The defendant finally contends that the trial justice erred in adjudicating him in contempt. The state first asserts that defendant has waived this argument because he failed to object to the finding of contempt either at the time of the contempt adjudication or later at the time of sentencing; the state also argues that the contempt finding was appropriate.

We first address the state's contention that defendant has waived the right to challenge the adjudication of contempt. Certainly defendant never objected to the contempt adjudication; he argues, however, that he was precluded from the opportunity to preserve his right to such a challenge due to the trial justice's failure to certify the factual basis for the contempt finding. See Rule 42(a) of the Superior Court Rules of Criminal Procedure.[10] Although defendant contends that the trial justice's failure to certify the basis for contempt constitutes error, the record contains no hint of an objection in the trial court to either the alleged procedural infirmities or the substantive adjudication of contempt. Without such an objection, those issues are not properly before us, and we conclude that defendant has waived his right to challenge the adjudication of contempt.

We would nonetheless comment that, even if the contempt issue were properly before us, we would not be inclined to reverse the trial justice's ruling. It is our strong policy to "firmly and steadfastly uphold the right of a trial justice to impose summary punishment in [certain] circumstances." See Nestel v. Moran, 513 A.2d 27, 30 (R.I. 1986). We recall that this Court has stated that "Rule 42(a) and its federal counterpart have been consistently interpreted to permit a court to dispense with due process requirements and exercise its extraordinary but narrowly

---

[10] Rule 42(a) of the Superior Court Rules of Criminal Procedure provides for summary contempt—which is sometimes referred to as direct contempt.

limited power to punish summarily for contempt only in specifically delineated circumstances * * *." Nestel, 513 A.2d at 28–29. Those "specifically delineated circumstances" are present "when the alleged misconduct has occurred in open court, in the presence of the judge, which disturbs the court's business, where all of the essential elements of the misconduct are under the eye of the court, are actually observed by the court, and where immediate punishment is essential to prevent 'demoralization of the court's authority before the public.'" Id. at 29 (quoting In re Oliver, 333 U.S. 257, 275 (1948)).

The defendant argues on appeal that he was merely emotional in his outburst in court on October 15, 2009. Certainly, we recognize that, in the words of the United States Court of Appeals for the First Circuit, "courtrooms, especially in criminal cases, are theaters of extreme emotion—stoked by the facts of the alleged crimes, the tensions of striving lawyers and hostile cross examination, and the fearsome stakes." See United States v. Browne, 318 F.3d 261, 266 (1st Cir. 2003).

That being said, it is nonetheless our view that, in this instance, the trial justice did not err in summarily adjudicating the defendant in contempt. Although "not every impolite or vulgar remark suffices to justify contempt proceedings," United States v. Marshall, 371 F.3d 42, 48 (2d Cir. 2004), summary contempt is permissible when a "verbal attack * * * [is] so unnecessary and so insulting to judicial authority." Id. The defendant's conduct occurred in the courtroom as the defendant was exiting. The defendant's comments and conduct certainly occurred in open court and in the trial justice's presence. See Nestel, 513 A.2d at 29. It is clear from the record that the court's business was disturbed to the point where the trial justice deemed it appropriate for the defendant to be brought back immediately before the court so that he could be informed of the trial justice's contempt finding, after which the defendant proceeded to repeat that the trial

justice (among others) had "better watch it." That conduct is precisely the unnecessary and insulting conduct towards the court for which the summary contempt procedure is designed. See Marshall, 371 F.3d at 48.

# V

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of conviction. In addition, we affirm the adjudication of contempt. The records in this case may be remanded to the Superior Court.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**  State v. Anderson Price.

In re Anderson Price.

**CASE NO:**  No. 2010-70-C.A.
(W2/08-389A)

No. 2010-262-M.P.
(KM 09-1413)

**COURT:**  Supreme Court

**DATE OPINION FILED:**  May 1, 2013

**JUSTICES:**  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**  Associate Justice William P. Robinson III

**SOURCE OF APPEAL:**  Washington County Superior Court

Kent County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Bennett R. Gallo

**ATTORNEYS ON APPEAL:**

For State:  Christopher R. Bush
Department of Attorney General

For Defendant:  Thomas Connolly
Office of the Public Defender