**Supreme Court**

No. 2012-115-C.A.

(P2/09-1333AG)

State                         :

v.                          :

John Quaweay.                  :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

| | |
|---|---|
| State | : |
| v. | : |
| John Quaweay. | : |

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Indeglia, for the Court.** The defendant, John Quaweay[1] (Quaweay or defendant), appeals from a Superior Court order denying his motion for a new trial based on newly discovered evidence. Quaweay was previously convicted by a jury of four counts of assault with a dangerous weapon, three counts of using a firearm during a crime of violence, and one count of carrying a firearm without a license. On appeal, he ascribes error to the trial justice's finding that information about federal marshals visiting the apartment of one of the state's witnesses did not constitute newly discovered evidence. For the reasons set forth in this opinion, we affirm the order of the Superior Court.

## I

### Facts and Travel

Sometime around 1 a.m. on March 24, 2009, a gunman walked through the front doors of the Sportsman's Inn, a hotel and nightclub in downtown Providence, Rhode Island, and fired several shots from close range at a group of five individuals trapped in the small lobby.

---

[1] The defendant's last name alternatively appears in the record as "Quaweay" and "Queweay." Since defendant appears to sign his name "Quaweay," we utilize that spelling throughout this opinion.

Although all five people survived that night, four were struck by bullets during the burst of gunfire.[2] Of those individuals fired upon, only Steven Roderick, the hotel's desk clerk, made a positive identification of the gunman.[3] Immediately after the shooting, Mr. Roderick was taken to the police station where he picked defendant's picture out of an array of six photographs.

The next day, March 25, 2009, the Providence police went in search of defendant at the apartment that he shared with his then-girlfriend, Melissa Rathier, an exotic dancer at the Sportsman's Inn. The police found only Ms. Rathier at home. Later that evening, Det. Michael Otrando of the Providence Police Department interviewed Ms. Rathier at the police station. During the interview, Ms. Rathier informed the police that defendant had mentioned fleeing the state of Rhode Island when she last saw him leaving their apartment earlier that afternoon. She told Det. Otrando that defendant was aware that the police were looking for him in connection with the shooting. Ms. Rathier clarified, however, that defendant "never said that he did it."

Approximately two weeks later, on April 13, 2009, Det. Otrando interviewed Ms. Rathier again. During the second interview, Det. Otrando asked Ms. Rathier if defendant had told her what happened on the night of the shooting. Ms. Rathier explained that when defendant entered their apartment that night, he told her something to the effect of "I'm sorry, it's over." The day after the incident, defendant mentioned to her that he was upset that Donna DiFalco,[4] the

---

[2] Donna DiFalco, a bartender at the nightclub, suffered the worst injuries when a bullet lodged in the back of her head, fracturing her skull. Another bullet hit the sneaker of Jasmin Rosario, an exotic dancer at the nightclub. A bullet also grazed the heel of Walter Crawley, an off-duty desk clerk for the hotel. Joel Sennon, the only nonemployee among the victims, was reported to have suffered injuries to his hands when he attempted to wrestle the gun away from the shooter. Steven Roderick was the only one of the five victims to escape without being struck by a bullet.

[3] Although no one other than Mr. Roderick was able to positively identify defendant as the shooter, there was testimony at trial that several individuals at the scene of the shooting mentioned "[Melissa Rathier]'s boyfriend."

[4] After the shooting but before trial, Donna DiFalco married and changed her last name to Hawes. We refer to Ms. DiFalco by her maiden name.

nightclub's bartender, had been wounded in the shooting because defendant "really liked Donna." According to Ms. Rathier's statement, defendant made some reference to a man running out from behind a desk and placing Ms. DiFalco in the line of fire. Detective Otrando asked Ms. Rathier, "[defendant] told you that he * * * accidentally shot Donna?" Ms. Rathier replied, "Yeah, he told me that right before he left. But * * * that night * * * he was on co[caine] with a gun on the floor. I was scared to even get up * * * because * * * he might * * * twitch and then pull the trigger."

On May 1, 2009, the state filed a nine-count criminal information which charged defendant with four counts of assault with a dangerous weapon, four counts of discharging a firearm during a crime of violence, and one count of carrying a firearm without a license.[5] After a search by local and federal law enforcement agencies, defendant was apprehended somewhere in the state of Georgia on June 30, 2009.[6] He was tried before a Providence County Superior Court jury over the course of five days in early December 2009.

At trial, the state presented Ms. Rathier. Although neither of Ms. Rathier's two interviews with Det. Otrando were admitted into evidence as full exhibits, counsel for the state attempted to question Ms. Rathier about the second interview. Ms. Rathier insisted that she had little memory of the second interview because she was intoxicated at the time it was conducted. Even after being shown a copy of the transcript from the interview to refresh her recollection, Ms. Rathier continued to insist that she could not recall what she told Det. Otrando because she had been too intoxicated. She specifically denied having any memory of informing Det. Otrando

---

[5] Count 8 of the information was later dismissed pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure. That particular count charged defendant with feloniously assaulting Joel Sennon. The state eventually dismissed count 8 after making several unsuccessful attempts to secure Mr. Sennon's presence for trial.

[6] The defendant was apprehended in Georgia after authorities received a tip from someone who had seen him featured on the television program "America's Most Wanted."

that defendant had admitted to accidentally shooting Ms. DiFalco while attempting to shoot someone else. Ms. Rathier recalled telling Det. Otrando about defendant lying on the floor with a gun but insisted that she was not referring to the night of the shooting.

On cross-examination, Ms. Rathier further distanced herself from her statement. She claimed that during the time leading up to the second interview, she had heavily abused ecstasy[7] and that she was tired, frazzled, and hung-over during the interview. She also claimed that Det. Otrando had confused her with his questions by skipping from one subject to another. When asked if defendant had ever acknowledged that he was involved in the shooting, Ms. Rathier denied that defendant had made any such admission. She further denied that defendant had taken any responsibility for injuring Ms. DiFalco.

The state also presented Det. Otrando, who averred that Ms. Rathier did not appear to be under the influence of alcohol or any other substances during either the first interview or the second interview. According to his recollection of the second interview, Ms. Rathier stated that defendant had admitted to accidentally shooting Ms. DiFalco. Detective Otrando also recalled Ms. Rathier telling him that, on the night of the shooting, defendant returned to their apartment carrying a handgun and acting erratically.

Over the course of trial, the state presented seven other witnesses, including four of the individuals who were present in the lobby during the shooting. One of those four individuals, Mr. Roderick, testified that he was certain that defendant was the man whom he had seen holding a gun in the hotel lobby on the night of the incident. The defendant did not testify or present any witnesses.

---

[7] Ecstasy is the street name for MDMA, or methylenedioxymethamphetamine, "[a] drug * * * that is chemically related to amphetamine * * * and is used illicitly for its euphoric and hallucinogenic effects. It reduces inhibitions[.]" American Heritage Dictionary of the English Language 1085 (4th ed. 2009).

On December 8, 2009, the jury found Quaweay guilty on all counts. The trial justice sentenced defendant on March 25, 2010 to a total of twenty-five years to serve, with twenty non-parolable years, followed by ten years probation. Quaweay filed a notice of appeal that same day. A final judgment of conviction and commitment entered on April 5, 2010.

On November 16, 2010, Quaweay withdrew his appeal. Upon remand to the Superior Court, Quaweay once again appeared before the trial justice on December 2, 2011. At that hearing, defendant requested a new trial based on allegedly newly discovered evidence that the United States Marshals Service (marshals) had visited the apartment of Ms. Rathier. The trial justice afforded defendant an opportunity to address the court.[8] The defendant explained that, after his conviction, he received a visit at the Adult Correctional Institutions from Ms. Rathier. During that visit, Ms. Rathier mentioned that, sometime before trial, federal marshals had come to her apartment in search of defendant after she had used defendant's debit card to make an online purchase. According to defendant, the marshals found Ms. Rathier in possession of narcotics. He alleged that the visit from the marshals had occurred before Ms. Rathier's second interview with Det. Otrando on April 13, 2009. The visit from the marshals, defendant claimed, gave Ms. Rathier a motive to falsely inculpate him in the shooting during her second interview.

After allowing Quaweay to speak at length, the trial justice ruled on his motion. The trial justice found that defendant's information about the marshals did not constitute "newly discovered evidence." He reasoned that defendant's trial counsel had received any and all information to which defendant was entitled that may have related to Ms. Rathier's second

---

[8] Counsel was appointed to represent defendant at the hearing on his motion for a new trial. Counsel informed the trial justice that, in his opinion, none of the arguments that defendant was seeking to advance were supported by existing law or a good-faith argument for modification of existing law. The trial justice then allowed defendant to directly address the court. At the end of the hearing, the trial justice granted counsel's motion to withdraw.

interview. The trial justice pointed out that defense counsel had effectively cast several shades of doubt on the veracity of Ms. Rathier's statements from the interview. During cross-examination, Ms. Rathier insisted that she was intoxicated at the time of the interview, admitted to using a significant amount of ecstasy in the month preceding the interview, and essentially repudiated her statements by denying that defendant had ever mentioned the shooting to her. Accordingly, the trial justice denied defendant's request for a new trial. An order to that effect entered on March 23, 2012. The defendant timely appealed to this Court.

Additional facts will be provided, as necessary, to discuss the issue raised on appeal.

**II**

**Discussion**

The defendant's sole contention on appeal is that the trial justice improperly denied his motion for a new trial based on newly discovered evidence. We have described a trial justice's consideration of a motion for a new trial based on newly discovered evidence as essentially a two-pronged analysis. See State v. Price, 66 A.3d 406, 417 (R.I. 2013). On the first prong, the defendant bears the burden of proving that the proffered evidence is "(1) newly discovered since trial, (2) not discoverable prior to trial with the exercise of due diligence, (3) not merely cumulative or impeaching but rather material to the issue upon which it is admissible, [and] (4) of the type which would probably change the verdict at trial." State v. Woods, 936 A.2d 195, 197 (R.I. 2007) (quoting State v. Firth, 708 A.2d 526, 532 (R.I. 1998)). Only if these four requirements are satisfied does the trial justice then proceed to the second prong of the analysis where he or she determines if the evidence is sufficiently credible to warrant a new trial. See id. On appeal, we will not overturn a "trial justice's denial of a motion for a new trial based upon newly discovered evidence * * * absent an indication that 'he or she overlooked or misconceived

relevant and material evidence or was otherwise clearly wrong.'" <u>Price</u>, 66 A.3d at 418 (quoting <u>State v. Hazard</u>, 797 A.2d 448, 464 (R.I. 2002)).

The defendant asserts that the trial justice clearly erred in finding that Ms. Rathier's information about the marshals' visit to her apartment was not newly discovered evidence. According to defendant, such evidence could not have been discovered prior to trial through a diligent search. He also suggests that the trial justice's consideration of his motion was perfunctory. The defendant points to the fact that the trial justice did not perform the credibility assessment required under the second prong of the analysis.

"[A]fter a defendant has had his [or her] day in court and has been fairly tried," he or she "has a heavy burden" when "seeking a new trial on the ground of newly discovered evidence." 3 Charles Alan Wright and Sarah H. Welling, <u>Federal Practice and Procedure</u>, § 583 at 445 (4th ed. 2011). For a defendant to satisfy his burden of showing that information could not have previously been discovered through a diligent search, we have ordinarily required the defendant to show that he made a reasonable investigation of evidence which was available to him prior to trial. <u>See</u>, <u>e.g.</u>, <u>Hazard</u>, 797 A.2d at 465 (the defendant "failed to demonstrate that he exercised the requisite degree of diligence" to obtain alibi evidence where the defendant knew about traffic stop and could have "simply * * * placed a phone call to * * * police barracks"); <u>State v. Hernandez</u>, 641 A.2d 62, 73 (R.I. 1994) (witness's testimony did "not pass the threshold test for newly discovered evidence" where defense counsel did not make a diligent attempt to interview witness prior to trial); <u>State v. Brown</u>, 619 A.2d 828, 833 (R.I. 1993) (counsel was aware of compensation statute and could have obtained evidence prior to trial by inquiring at clerk's office); <u>State v. Sullivan</u>, 83 R.I. 1, 4, 111 A.2d 838, 840-41 (1955) (diligence not shown where

counsel neither made inquiries about bus ticket found in the defendant's possession nor alleged that he was prevented from making such inquiries).

Here, Ms. Rathier's second interview was among the evidence available to defendant prior to trial. The state suggests that Ms. Rathier's second interview contains nearly all of the information that defendant alleges to be "newly discovered." At the time of the second interview, defendant was still a fugitive. The state points to a portion of that interview where Det. Otrando asked Ms. Rathier, "If [defendant] contacts you, are you gonna call me?" Ms. Rathier responded:

> "I'll call you. I won't call that other guy. * * * I don't like * * * them, the way they approached me. He came in my house, threatening me. I had to RE-COOPERATE. They rang the doorbell. I opened the door for them. 'I SMELL WEED.' * * * [i]t's better than going around shooting people. Big deal. So, they come in and they, they start lifting up my papers, 'Oh, we should lock her up right now.' This and that. * * * We're gonna send you TO INDIANA. * * * I'm like, 'You think I don't understand the severity? You think I, I'm stupid to all this?' * * * I'm already nervous of him. You make me nervous of you. * * * Like, you're asking me to help you, but if you're INAUDIBLE, and I won't be able to, like, you know, get through the next day. And * * * I actually had to call him three days later. And go[], 'Listen, are you guys gonna, like, come bust in my house again?' INAUDIBLE." (Capitalization in original.)

The defendant stresses that this passage from Ms. Rathier's statement lacks clarity. We agree with the state, however, that a careful reader who made a reasonable effort to follow up on this excerpt could have unearthed all of the information which defendant claims is newly discovered. Ms. Rathier's response to Det. Otrando reveals that she had been visited at her home by law-enforcement agents seeking her assistance in apprehending defendant. It is also obvious that those law-enforcement agents suspected Ms. Rathier was in possession of marijuana and that Ms. Rathier feared that she might be imprisoned if she did not cooperate. Although Ms. Rathier

does not explicitly declare that this visit was from the federal marshals, we question whether threats from federal, as compared to state, law enforcement makes any meaningful difference with regard to Ms. Rathier's alleged bias or motive to lie. Even accepting, however, that the distinction is relevant, Ms. Rathier's specific reference to being imprisoned in Indiana would suggest to an attentive reader that federal rather than state or local authorities were responsible. Moreover, since defendant was apprehended in Georgia and extradited to Rhode Island, it could not have escaped notice that law enforcement other than the Providence police had been involved in the search.

In addition to this information, the record shows that Ms. Rathier also made reference to "state marshals" visiting her apartment when counsel conducted voir dire of Ms. Rathier, before she testified in front of the jury. The prosecutor asked her during voir dire if she had informed the Providence police that defendant had family in Georgia, to which Ms. Rathier responded:

> "No. They told me that [defendant] had family in Georgia, and I said, 'Yeah, he did say.' I'm not sure. Maybe I told them, but the state marshals told me that – they're like, we know he has family in Georgia * * *. * * * And I had told the marshals all this when they came into my apartment * * *."

In this response, Ms. Rathier distinguishes the "state marshals," who visited her apartment, from "them," the Providence police. A few questions later, she again referred to her encounter with the marshals:

> "The state marshals were telling me that * * * they had reason to believe [defendant] was either still in Providence, or he was in Georgia, and the detectives were telling me that they believed he was in Pawtucket. Either [the] detectives or the state marshals; they told me they thought he was in Pawtucket * * *."

If defendant wanted Ms. Rathier to explain her answer about the "state marshals" or clarify her statement to Det. Otrando, defense counsel could have questioned her about either during voir dire.[9]

In light of the information contained in Ms. Rathier's second statement and her answers during voir dire, we conclude that the defendant has failed to meet his burden of demonstrating that evidence about the marshals' visit to Ms. Rathier's apartment could not have previously been discovered through the exercise of reasonable diligence. Since we hold that the defendant did not satisfy his burden under the first prong of the new-trial analysis, we cannot accept the defendant's argument that the trial justice prematurely denied his motion by not reaching the second prong. If a defendant fails to satisfy the first component of the two-pronged test for newly discovered evidence, then the trial justice is not required to consider the remaining criteria. See State v. Binns, 732 A.2d 114, 118 (R.I. 1999). In sum, we discern neither clear error nor a misconception of material evidence in the trial justice's denial of the defendant's motion for a new trial.

## III

### Conclusion

For the reasons articulated in this opinion, we affirm the order of the Superior Court. The record in this case may be returned to the Superior Court.

---

[9] Defense counsel did not interview Ms. Rathier prior to trial or hire an investigator to speak with her. The defendant suggested at oral argument that counsel may not have had an opportunity to interview Ms. Rathier. There is nothing in the record to suggest that defense counsel attempted to interview Ms. Rathier but was prevented from doing so. Nonetheless, even if we were to assume that counsel did not have access to Ms. Rathier prior to trial, defense counsel did have an opportunity to question Ms. Rathier before she testified in front of the jury because the trial justice allowed counsel to voir dire Ms. Rathier.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**      State v. John Quaweay.

**CASE NO:**      No. 2012-115-C.A.
(P2/09-1333AG)

**COURT:**      Supreme Court

**DATE OPINION FILED:**   May 2, 2014

**JUSTICES:**      Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**      Associate Justice Gilbert V. Indeglia

**SOURCE OF APPEAL:**    Providence County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Robert D. Krause

**ATTORNEYS ON APPEAL:**

For State:  Virginia M. McGinn
Department of Attorney General

For Defendant:  Catherine Gibran
Office of the Public Defender